# United States Court of Appeals for the Federal Circuit

---

**LANCE ROBINSON,**
*Petitioner*

**v.**

**DEPARTMENT OF VETERANS AFFAIRS,**
*Respondent*

---

2017-2143

---

Petition for review of the Merit Systems Protection Board in No. DE-0752-16-0351-I-1.

---

Decided: May 6, 2019

---

JULIA H. PERKINS, Shaw, Bransford & Roth P.C., Washington, DC, argued for petitioner. Also represented by JAMES PHILIP GARAY HEELAN, DEBRA LYNN ROTH.

HILLARY STERN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by REGINALD THOMAS BLADES, JR., ROBERT EDWARD KIRSCHMAN, JR., JOSEPH H. HUNT.

---

Before REYNA, TARANTO, and CHEN, *Circuit Judges.*

REYNA, *Circuit Judge*.

Lance Robinson appeals the Merit Systems Protection Board's decision to uphold the Department of Veterans Affairs' removal of Mr. Robinson as Associate Director of the Phoenix Veterans Administration Health Care System. Because the Merit Systems Protection Board did not abuse its discretion and its finding of negligence is supported by substantial evidence, we affirm.

BACKGROUND

Lance Robinson became the Associate Director of the Phoenix Veterans Administration Health Care System ("Phoenix VA") in May 2012. He had been the acting Associate Director from October 2011 through February 2012 and started his career with the U.S. Department of Veterans Affairs ("VA") in 1987. Mr. Robinson's job responsibilities included supervising most of the Phoenix VA administrative personnel, Health Administration Services ("HAS"), human resources, and a number of other departments. HAS is responsible for managing the scheduling of appointments at the Phoenix VA. Employees in these departments reported to Robinson through a number of supervisors and department chiefs. During his tenure as Associate Director, Mr. Robinson was aware that scheduling issues were a problem, including the fact that it often took more than thirty days for patients to receive new-patient appointments.

In early 2014, U.S. Congressman Jeff Miller, Chairman of the House Committee on Veterans' Affairs, made public allegations that forty veterans died while on "secret" wait-lists at the Phoenix VA. J.A. 5. These accusations led to an investigation by the Office of the Inspector General ("OIG") and the Department of Justice ("DOJ"). As a result, the VA put Robinson on administrative leave on May 2, 2014.

On May 28, 2014, OIG issued an interim report that addressed the waitlist allegations at the Phoenix VA. The report suggested that HAS supervisors should have known about the 1,700 veterans that had been waiting on the New Enrollee Appointment Request ("NEAR") list for longer than thirty days and had not yet seen a physician or had not been moved to the Electronic Wait List ("EWL"). The NEAR list is used to alert schedulers "that a newly enrolled Veteran has requested an appointment during the enrollment process." J.A. 2. EWL "is the official [Veterans Health Administration] wait list . . . used to list patients waiting to be scheduled, or waiting for a panel assignment." J.A. 2. The Veterans Health Administration ("VHA") Outpatient Scheduling Directive 2010-027 ("Scheduling Directive"), dated June 9, 2010, outlined procedures for scheduling VA patients for medical appointments and required HAS to use NEAR and EWL to do so. It also mandated that no other waitlists besides the EWL were to be used to track VA outpatient appointments.

On May 30, 2014, based on the OIG interim report, the VA's Deputy Chief of Staff proposed that Robinson be removed as the Associate Director of the Phoenix VA due to his "failure to provide oversight." J.A. 6030. The VA's Assistant Secretary of the Office of Security and Preparedness, Kevin Hanretta, was named Deciding Official in Robinson's case. Mr. Hanretta did not take action on Robinson's proposed removal. Robinson remained on administrative leave for two years, returning to duty in January 2016.

Meanwhile, OIG, DOJ, and Congress continued to investigate the allegations of secret waitlists at the VA. The Senate Committee on Veterans' Affairs ("Senate Committee") asked Dr. David Shulkin, the Under Secretary for Health at the time, why many senior executives were placed on paid administrative leave instead of removed from office for the deaths of veterans who languished on secret waitlists. J.A. 7106–07. Dr. Shulkin replied that

although the VA would like to conclude its disciplinary actions, "[t]he U.S. attorney . . . has prohibited us from interviewing those individuals." J.A. 7107; *see also* J.A. 7099. On December 28, 2015, Mr. Robinson, having heard Dr. Shulkin's statements, submitted a letter to the Chairman of the Senate Committee and another ranking member of the same Committee "to correct [Dr. Shulkin's] inaccurate testimony." J.A. 6866. Mr. Robinson claimed that the VA called him to testify regarding patient wait times and that OIG also interviewed him on June 9, 2015. J.A. 6869–70. On January 13, 2016, Senator John McCain, a member of the Senate Committee, expressed his disappointment in the VA, stating: "During the recent Senate Veterans Affairs Committee hearing on health care and accountability at the Phoenix VA Health Care System, senior VA officials repeatedly gave inaccurate testimony to my questions on why no actions have been taken against these officials." J.A. 7163.

In January 2016, Mr. Robinson returned to active duty status and began working at Veterans Integrated Service Network ("VISN") 18, the regional entity that oversees the Phoenix VA. About three months later, on March 14, 2016, Deputy Secretary Sloan Gibson issued a second proposal for Robinson's removal, rescinding the May 30, 2014 notice. J.A. 486. Mr. Gibson charged Mr. Robinson with three grounds for removal: (1) negligent performance of duties (six specifications); (2) failure to ensure accuracy of information provided (three specifications); and (3) retaliation against another VA employee for making protected disclosures, which is prohibited by the Whistleblower Protection Enhancement Act (six specifications). J.A. 7, 486–89. On June 7, 2016, Mr. Gibson, who served as both the Proposing Official and Deciding Official, sustained all charges against Mr. Robinson and removed him as Associate Director of Phoenix VA.

Charge 1 of the second proposal for removal alleged that Mr. Robinson negligently performed his duties as Associate Director. Specifications 1 and 4 outlined how Mr. Robinson negligently failed to ensure that HAS personnel used NEAR to schedule appointments or put veterans on EWL. J.A. 486–87. Specification 2 accused Mr. Robinson of failing to make certain that subordinates scheduled veterans for appointments or placed them on EWL after capturing patient information on screenshots. J.A. 486. The remaining specifications accused Mr. Robinson of failing to ensure that HAS personnel (1) scheduled veterans for primary care appointments after visiting the emergency room (specification 3); (2) used EWL in all outpatient settings in compliance with VA instructions (specification 5); and (3) used the Recall/Reminder[1] software to request follow-up appointments when an appointment could not be immediately scheduled, as dictated by VA policy (specification 6). J.A. 2, 486–87.

Charge 2 alleged that Mr. Robinson did not ensure that he, or his subordinates, provided accurate information to VISN 18. J.A. 487. In particular, Robinson failed to conduct daily assessments of "scheduling accuracy processes" (specification 1) or accurately provide information regarding the use of EWL (specification 2) and NEAR (specification 3). J.A. 487.

On March 15, 2016, one day before Mr. Robinson was served with his second notice of proposed removal, Deputy Secretary Sloan Gibson made statements in a news interview regarding the status of senior VA personnel allegedly responsible for the secret waitlist scandal. Mr. Gibson reportedly stated "he was disappointed that it took so long

---

[1] Recall/Reminder is an application used to manage appointments scheduled more than three to four months away.

for the executives to be removed," and "he was confident that the latest firings would be upheld on appeal." J.A. 7186–87. These statements were published in the *New York Times*. On June 7, 2016, Mr. Gibson issued the Decision Regarding Proposed Removal, removing Mr. Robinson from his position as Associate Director of Phoenix VA.

Mr. Robinson appealed to the Merit Systems Protection Board ("Board"). The administrative judge ("AJ") affirmed the VA's decision to remove Robinson on the grounds that he was negligent in the performance of his duties and that he failed to provide accurate information to his supervisors. J.A. 2. The Board did not sustain the whistleblowing retaliation charge against Mr. Robinson. J.A. 43. Mr. Robinson appeals the Board decision. We have jurisdiction under 28 U.S.C. § 1295(a)(9) and 5 U.S.C. § 7703(b)(1).

## DISCUSSION

This court shall set aside any Board decision found to be arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence. 5 U.S.C. § 7703(c). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Frederick v. Dep't of Justice*, 73 F.3d 349, 352 (Fed. Cir. 1996) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). An example of an abuse of discretion is an erroneous interpretation of law or unreasonable judgment in weighing relevant factors. *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 836 (Fed. Cir. 2006) (quoting *Lacavera v. Dudas*, 441 F.3d 1380, 1383 (Fed. Cir. 2006)).

When an agency takes adverse action against an employee, the agency must establish by a preponderance of the evidence that (1) the charged conduct occurred; (2) there is a nexus between the conduct and efficiency of service; and (3) the imposed penalty was reasonable. *Bryant v. Nat'l Sci. Found.*, 105 F.3d 1414, 1416 (Fed. Cir. 1997) (citing 5 U.S.C. §§ 7701(c)(1)(B), 7513(a)).

On appeal, Mr. Robinson contends that substantial evidence does not support the Board's decision to sustain removal; that removal was not a reasonable disciplinary action; that the VA failed to meet its burden to show by clear and convincing evidence that he would have been removed absent his protected disclosures against Dr. Shulkin; and that his due process rights were violated. We address each argument below.

## A. Charge 1: Negligent Performance of Duties

There is no dispute that VA personnel failed to use NEAR or EWL, ultimately leading to thousands of veterans going unseen for medical care. The question here is whether Mr. Robinson was negligent in that he knew or should have known that his subordinates consistently failed to use scheduling practices required by VA policy. In short, the answer is yes. Mr. Robinson was a member of upper-level management responsible for ensuring that HAS personnel complied with the policies set forth in the Scheduling Directive. Instead, he took a hands-off approach to managing the scheduling problems at Phoenix VA despite knowing the severity of scheduling problems permeating the system. Accordingly, the Board did not err in sustaining the negligence charges against Mr. Robinson.

Mr. Robinson argues that substantial evidence does not support a finding that he acted negligently in the performance of his duties. He attacks the evidence supporting each of the Board's findings with respect to each of the six specifications listed in the second notice of removal. We address each specification, and the evidence assessed by the Board, in turn.

*Specifications 1, 2, and 4*

Specifications 1, 2, and 4 all similarly allege that Mr. Robinson failed to properly supervise HAS personnel to ensure that NEAR and EWL were used to schedule veterans for medical appointments. Mr. Robinson contends that

because he did not actually know that his subordinates were not using NEAR or EWL, he cannot be held liable for the actions of his subordinates. To the contrary, substantial evidence supports a finding that Mr. Robinson knew, or should have known, of his subordinates' failure to use NEAR and EWL.

An individual is negligent in the performance of his duties if he fails to exercise the degree of care that "a person of ordinary prudence" with the same experience would exercise in the same situation. *Velez v. Dep't of Homeland Sec.*, 2006 M.S.P.B. 116, ¶ 11 (2006) (citing *Mendez v. Dep't of the Treasury*, 88 M.S.P.R. 596, ¶ 26 (2001)), *aff'd*, 219 F. App'x 990 (Fed. Cir. 2007). A supervisor cannot be held responsible for the conduct of his subordinate unless he directed, knew, or should have known of the subordinate's misconduct and acquiesced to the improper behavior. *Miller v. Dep't of Health & Human Servs.*, 7 M.S.P.B. 713, 714–15 (1981).[2] Factors to consider under the "knowledge and acquiescence standard" are (1) the knowledge the supervisor had, or should have had, of the subordinate's misconduct; (2) the existence of policies or practices relevant to the misconduct; and (3) the extent to which the supervisor directed or acquiesced to the subordinate's misconduct. *Id.* The Board may also consider the experience of the supervisor, including his length of service, as well as the number of employees under the supervisor's purview. *Id.* Not all of the factors iterated above are relevant in every case. *Id.* But, in each instance, the relevant factors are weighed to discern whether the supervisor may be held responsible for the actions of his subordinates. *Id.*

As an initial matter, Mr. Robinson misunderstands the charges against him. Specifications 1, 2, and 4 do not

---

[2]   Although *Miller* is a non-binding Board decision, neither party has suggested that a different standard should be applied.

charge Robinson for "the failings of subordinates," as he contends. Appellant Br. 38. Rather, Mr. Robinson is charged with the failure to perform *his* duties as Associate Director. The charge against Mr. Robinson—negligent performance of duties—implicates the behavior of his subordinates because his failure to supervise HAS personnel, among others, is at the root of each of specifications 1, 2, and 4. Therefore, we apply the *Miller* standard to assess whether Mr. Robinson negligently performed his duties by "allowing a situation to exist in which his subordinates acted improperly." *Miller*, 7 M.S.P.B. at 713.

The VA clearly had a policy dictating the scheduling of outpatient appointments—in this case, the Scheduling Directive. The Scheduling Directive also aimed to "ensur[e] the competency of staff directly or indirectly involved in any, or all, components of the scheduling process," and explicitly cautioned "[f]acility leadership [to] be vigilant in the identification and avoidance of inappropriate scheduling activities." J.A. 676, 686. As part of the "facility leadership," Mr. Robinson had a duty to ensure that his subordinates complied with the Scheduling Directive and used NEAR and EWL to schedule outpatient appointments.

Importantly, Mr. Robinson was aware of the Scheduling Directive when it issued in 2010. He testified that the VA issued the Scheduling Directive when he was Associate Director at the Amarillo VA Medical Center. J.A. 11713.

Substantial evidence shows Mr. Robinson had actual knowledge of the Phoenix VA's scheduling problems during his tenure as Associate Director of Phoenix VA. On January 7, 2012, VISN 18 issued an Appointment Scheduling Audit Report that assessed whether "VISN facilities were compliant with VHA policy and regulatory guidance related to appointment scheduling and use of the Electronic Wait List." J.A. 751. Among other things, the audit noted "Phoenix was not appropriately placing patients on the

EWL." J.A. 794; *see also* J.A. 753 ¶ 4. Mr. Robinson was acting Associate Director of the Phoenix VA at the time the audit report issued and is listed on the distribution list.

Then, in July 2013, Mr. Robinson was copied on a series of emails detailing occurrences at the Phoenix VA where veterans were not put on the EWL. For example, Mr. Robinson received an email chain detailing the Phoenix VA's failure to put a veteran on EWL for eighteen months. J.A. 1234–37. He received another email outlining "[t]he patient complaints on the EWL." J.A. 1236. In yet another email, Mr. Robinson was alerted to an instance where a veteran's referral for a primary care appointment after visiting the emergency room "wasn't addressed for 2 months." J.A. 1220. Unfortunately, the veteran passed away before the Phoenix VA even called to schedule the follow-up appointment requested by the emergency physician.

In December 2013, Bradley Curry, the Chief of HAS, confirmed that executive management understood the VISN scheduling audit findings and the deficiencies in the Phoenix VA's scheduling system. In an email addressed to Mr. Robinson, among others, Mr. Curry noted

> The VISN team found key Scheduling Directive requirements were not fully implemented as described in VHA Scheduling Directive 2010-027, including a systematic process for the identification and avoidance of *inappropriate scheduling activities, full implementation of the Electronic Wait List (EWL)* as described in the Scheduling Directive *and full implementation of the Recall System* as described in the Directive. Findings were discussed with staff, and the teams immediately began to form a collaborative action plan.

J.A. 1225 (emphases added). Thus, Robinson knew of HAS's wrongdoing, namely, its failure to use NEAR, the EWL, and the Recall/Reminder software. Susan Bowers,

VISN 18's Director, also testified that Mr. Robinson "knew what was going on in his service and what was going on in the facility as a whole." J.A. 11020 (56:16–18).

Mr. Robinson contends the evidence does not show he had knowledge of the misconduct because he asserts the *Miller* standard requires a "robust" showing of actual knowledge. Appellant Br. 38. This is an incorrect reading of the rule, which *considers*, among other factors, "the knowledge a supervisor has, *or should have*, of the conduct of subordinates." *Miller*, 7 M.S.P.B. at 714–15 (emphasis added). Therefore, when considering whether Mr. Robinson negligently performed his duties, we may consider whether a person of ordinary prudence in a similar situation should have known, or had reason to know, of his subordinates' misconduct. Indeed, *Miller* notes that the level of knowledge required to hold a supervisor responsible for the misconduct of his employees is considered on a sliding scale depending on the level of direct control the supervisor has over the subordinates committing misconduct. 7 M.S.P.B. at 715. In other words, "the greater the duty" to control the subordinates who committed the misconduct, "the less specific knowledge of the misconduct the supervisor will be required to have." *Id.* But "[w]here it has been shown that the supervisor has direct control over the employees committing the violation, the supervisor's general knowledge of relevant factors imposes an affirmative duty to investigate further." *Id.*

Regardless of whether Mr. Robinson had actual knowledge that employees directly responsible for scheduling were not using NEAR or EWL, Mr. Robinson had an affirmative duty to investigate in view of the emails discussed above, the VISN audit report, and the OIG interim report noting that 1,700 veterans languished on NEAR for more than thirty days. Indeed, Mr. Robinson directly supervised Bradley Curry, the Chief of HAS, whose department is responsible for scheduling veterans for outpatient appointments. Therefore, Mr. Robinson had a duty to

ensure that Mr. Curry and HAS were not only using NEAR and EWL to schedule appointments, but that no unofficial methods were being used instead, i.e., a queue of screenshots to be eventually inputted into EWL. *See Newton v. Dep't of Air Force*, 85 F.3d 595, 597 (Fed. Cir. 1996) ("[A]ppellant, as an experienced leader who supervised between 15 and 75 employees, was properly held to a high standard of conduct because he occupied a position of trust and authority.").

It also appears that Mr. Robinson acquiesced to the scheduling improprieties permeating HAS and failed to further investigate this misconduct. A prudent supervisor with about twenty-seven years experience with the VA—at least seven of which were as an associate director—would have asked the Chief of HAS to investigate the incidents discussed in the emails and the general findings of the VISN audit and OIG interim reports. While there is some evidence in the record that Mr. Curry explored these issues, it does not appear that Mr. Robinson followed up or directed Mr. Curry and HAS to implement the policy requiring use of NEAR and EWL. The record demonstrates that as of January 3, 2014, "several open action items [were] still open and delinquent" and EWL had not been implemented in all "appropriate" outpatient centers. J.A. 1065. "Completion of these actions are required for compliance with VHA Scheduling Directive 2010-027." *Id.* OIG also discovered that "Phoenix leadership did not disseminate previous communication regarding scheduling best practices to front line staff and supervisors." J.A. 816. Mr. Robinson had a duty to follow up with Mr. Curry and HAS to ensure compliance with VA policy, but the record does not show that he did and demonstrates that he did not.

Accordingly, there is substantial evidence to support the Board's decision to sustain specifications 1, 2, and 4 of Charge 1.

*Specifications 3, 5, and 6*

Specifications 3, 5, and 6 also relate to Mr. Robinson's failure to ensure that proper scheduling procedures were implemented. Mr. Robinson's only point of dispute regarding these specifications is that the Board failed to consider evidence that any deficiencies stemmed from a lack of resources and infrastructure. This is not correct.

When considering the substantiality of the evidence, contradictory evidence in the record that may detract from its weight must also be considered. *Frederick*, 73 F.3d at 352 (Fed. Cir. 1996) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). The Board did so here. It acknowledged testimony that "implementing the EWL required substantial resources," that "routinely checking the EWL would have taken more personnel than the facility had," and that "full implementation of the EWL was unrealistic." J.A. 22 (internal quotations omitted). Nonetheless, the Board reasoned that these issues "would not excuse [Mr. Robinson's] inaction and failures with respect to the EWL." J.A. 23; *see also* J.A. 24 (considering testimony regarding the impracticality of implementing Recall/Reminder and the staff required). We agree. Because the Board properly considered evidence on the lack of resources to implement all scheduling procedures required by the Scheduling Directive, we hold that the Board's decision to sustain specifications 3, 5, and 6 was supported by substantial evidence.

B. Charge 2: Failure to Ensure Accuracy of Information Provided

The VA also charged Mr. Robinson with three specifications directed to an alleged failure to ensure that the Phoenix VA provided accurate information to VISN 18. VISN 18 required Phoenix VA to prepare flowcharts reporting scheduling metrics, including the use of EWL. Specifications 1 and 2 are directed to information within flowcharts dated November 13, 2013. Specification 3 is

directed to the submission of inaccurate information in an "Outpatient Scheduling Processes and Procedures Check-list."

*Specifications 1 and 2*

Mr. Robinson argues there is no evidence showing he ever reviewed the November 13, 2013 flowcharts. He also contends that because the VA did not introduce complete copies of these flowcharts, he is unable to dispute the claim that the flowcharts contained inaccurate information. We address each argument in turn.

Whether Mr. Robinson actually reviewed the November 13, 2013 flowcharts is not material. The issue is whether the November 13 flowcharts contained inaccurate information. After examining testimony, emails, and other evidence, the Board answered that question in the affirmative. We agree.

To sustain specifications 1 and 2, Mr. Robinson need not have actually reviewed the flowcharts. *See Fairall v. Veterans Admin.*, 844 F.2d 775, 776 (Fed. Cir. 1998) (finding that negligent performance can include issues of "misconduct, neglect of duty, or malfeasance"). He need only have breached a duty to ensure that the information within these flowcharts was accurate. One of Mr. Robinson's responsibilities as Associate Director, i.e., a "facility director," was to audit "timeliness and appropriateness of scheduling actions as well as the accuracy of desired dates." J.A. 816. VISN 18 created a "collaborative action plan" to enable facilities to "to bring key aspects of the Scheduling Directive into compliance." J.A. 807, 816; *see also* J.A. 1065. One component of the action plan was for scheduling supervisors to review scheduling reports daily, including the AEG683 report, and summarize these results to leadership weekly. Another action item included creating a flowchart to show "the facility process from appointment creation to outcomes metrics." J.A. 1055; *see also* J.A. 819. Mr. Robinson and other Phoenix VA directors were charged

with providing monthly, then weekly, updates on Phoenix VA's progress. Mr. Robinson recognized it was "important that we accurately reflect" the scheduling processes at Phoenix VA and stated he "would have expected to review" the flowcharts. J.A. 29, 11783. Ms. Bowers, VISN 18's Director, asked Mr. Robinson to be involved in the creation of the flowcharts. Thus, the flowcharts fell within the purview of Mr. Robinson's job responsibilities.

The record shows that Mr. Robinson neglected his duty to ensure that the flowchart information submitted to VISN 18 was accurate. A reasonable, prudent Associate Director would have ensured that the flowcharts contained accurate information before transmitting them to VISN 18. Specifications 1 and 2 alleged that the November 13, 2013 flowcharts reflected that the (1) AEG683 reports were run daily and that (2) Phoenix VA schedulers were using NEAR and EWL. But this information was not accurate. A December 2013 email from Mr. Curry shows that "[t]he AEG 683 Report has not been reproduced routinely for approximately 4 months." J.A. 1275–76. In fact, the report had not been run "consistently" since July 2013. J.A. 1276. As discussed above, Phoenix VA schedulers were not using NEAR and EWL to make patient appointments. Section A, *supra*. Consequently, substantial evidence supports the Board's decision to sustain specifications 1 and 2.

Mr. Robinson argues that because the complete flowcharts were not submitted before the Board, there was not substantial evidence to support a determination that the information contained in the flowcharts was accurate or inaccurate. We recognize that the Board relied on the flowcharts to sustain the charge against Mr. Robinson, and that having the flowcharts in their entirety would have aided assessment of the allegations. But Mr. Robinson identifies no violation of his procedural rights in the absence of full flowcharts, so the only question is one of substantial evidence. That the Board did not receive complete copies of the flowcharts does not change the conclusion that

Mr. Robinson should have reviewed the flowcharts before they were sent to VISN 18, or the conclusion that the November 13 flowcharts contained inaccurate information.

The Board reviewed contemporaneous evidence and testimony that corroborated the presence of inaccuracies within the November 13, 2013 flowcharts. In particular, the Board relied on the testimony of VISN 18 employee Laurie Graaf, leader of the team overseeing Phoenix VA's compliance with the Scheduling Directive, to show VISN 18's skepticism of the accuracy of the flowchart. The Board also cited a number of contemporaneous emails that show that "the flowchart provided inaccurate information about the AEG683 report." J.A. 28; *see also* J.A. 30 (stating flowcharts were inaccurate); J.A. 1225. Additional testimony indicates that some thought the flowcharts were intended to be "aspirational," not to capture current processes. J.A. 26; *see also* J.A. 1055. Consequently, we see no error in the Board crediting Ms. Graaf's testimony, or the resulting conclusion that the flowcharts contained inaccurate information. We hold that complete copies of the November 13 flowcharts were not necessary for the Board to uphold specifications 1 and 2 where contemporaneous evidence and record testimony are substantial evidence supporting the Board's conclusion that the flowcharts contained inaccurate information.

*Specification 3*

Specification 3 alleges that Mr. Robinson submitted an "Outpatient Scheduling Processes and Procedures Checklist" that inaccurately reported Phoenix VA HAS personnel as reviewing the NEAR report. Mr. Robinson does not dispute that the checklist responses were inaccurate.

Mr. Robinson argues that specification 3 should not be sustained because there is no evidence that (1) VISN 18 reviewed the inaccurate "Outpatient Scheduling Processes and Procedures Checklist"; (2) Mr. Robinson actually reviewed the checklist responses; and (3) the checklist,

including its accuracy, was one of Mr. Robinson's job responsibilities.

As discussed above, whether VISN directors or Mr. Robinson actually reviewed the checklist is of no matter. The issue is whether Mr. Robinson, as a reasonable, prudent Associate Director, should have ensured the accuracy of the checklist.

The Board correctly concluded that Mr. Robinson should have ensured that accurate responses to the "Outpatient Scheduling Processes and Procedures Checklist" were provided to VISN 18. Mr. Robinson's conduct, and the conduct of his subordinates, shows that he and others believed that HAS required Robinson's approval before the checklist responses were sent to VISN 18. For example, after Chief of HAS Mr. Curry reviewed the checklist, an email was sent to Mr. Robinson "pending your concurrence." J.A. 1103–04. Mr. Robinson responded by complimenting Mr. Curry and others on the checklist. Accordingly, Phoenix VA personnel, including HAS, expected Mr. Robinson to review the checklist and its responses, including the accuracy of those responses. Therefore, it is not unreasonable to conclude that Mr. Robinson had a responsibility to ensure that HAS conveyed to VISN 18 accurate information about Phoenix VA's scheduling practices and any progress on key action items related to scheduling. Because there is no dispute as to the inaccuracy of the checklist, we see no error in the Board's determination.

## C. Reasonable Removal

We next consider whether substantial evidence supports the Board's determination that removal was reasonable. Mr. Robinson alleges that the Board was required to

independently weigh the *Douglas*[3] factors given that less than all charges were sustained by the Board. Mr. Robinson also contends that removal was unreasonable because other similarly situated individuals who, according to Robinson, committed greater misconduct, were not removed or disciplined at all. Mr. Robinson also argues that the Board erroneously considered "notoriety and [] public outrage" in its reasonability analysis, but he does not directly challenge the Board's finding that removal based on the charged conduct promoted efficiency. Appellant Br. 49.

To the extent Mr. Robinson contends the Board should have independently determined a reasonable penalty because it did not sustain Charge 3 (the whistleblowing charge), it was not within the Board's purview to do so. Indeed, when fewer than all charges are sustained

> the Board *may mitigate* to the maximum reasonable penalty *so long as the agency has not indicated* either in its final decision or during proceedings before the Board *that it desires that a lesser penalty be imposed on fewer charges.*

*Lachance v. Devall*, 178 F.3d 1246, 1260 (Fed. Cir. 1999) (emphases added).

Our case law has explicitly prohibited the Board from "independently determin[ing] penalties." *Lachance*, 178 F.3d at 1259; *see also Hathaway v. Dep't of Justice*, 384 F.3d 1342, 1353 (Fed. Cir. 2004); *Gray v. U.S. Postal Serv.*, 97 M.S.P.R. 617, 621 (2004) (citing *Lachance*, 178 F.3d at 1260). It is not the Board's place to "infringe upon an agency's exclusive domain as workforce manager" to

---

[3]    The *Douglas* factors are twelve factors to be considered when determining a reasonable penalty for an agency employee. *Tartaglia v. Dep't of Veterans Affairs*, 858 F.3d 1405, 1408 (Fed. Cir. 2017) (citing *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 332 (1981)).

"independently institute a new penalty." *Lachance*, 178 F.3d at 1258–59 (citing *Beard v. Gen. Serv. Admin.*, 801 F.2d 1318, 1322 (Fed. Cir. 1986)). "[W]e will defer to the judgment of the agency regarding the penalty unless it appears totally unwarranted in the circumstances" such that it constitutes an abuse of discretion. *Quinton v. Dep't of Transp.*, 808 F.2d 826, 829 (Fed. Cir. 1986); *see also Bryant*, 105 F.3d 1416. Simply put, the Board functions to determine whether or not the agency's penalty selection was reasonable in light of the sustained charges. *See Lachance*, 178 F.3d at 1257 (citing *Quinton*, 808 F.2d at 829).

As for the *Douglas* factors, we see no error in the Board's consideration of whether Robinson's removal was excessive given that Charge 3 was not sustained. J.A. 57–62. For example, the Board contemplated the nature and seriousness of the offense and its relation to Mr. Robinson's duties and position; Mr. Robinson's supervisory role, including the prominence of the Associate Director position; the duration of Mr. Robinson's career with the VA and his lack of previous disciplinary record; the loss of supervisory confidence in Mr. Robinson's abilities; and the notoriety of the offense. In considering these factors, the AJ relied on his assessment of Mr. Gibson's testimony. He "found Gibson to be a thoughtful, credible witness." J.A. 52. Mr. Robinson did not challenge Mr. Gibson's credibility and we see no basis to undermine the AJ's credibility determination here. *See Purifoy v. Dep't of Veterans Affairs*, 838 F.3d 1367, 1372 (Fed. Cir. 2016) (stating deference is given to the AJ's credibility findings when the AJ "relies expressly or by necessary implication on the demeanor of the witness." (internal citation omitted)). Based on the balance of these factors, the Board did not "find the agency's choice of penalty so excessive as to be an abuse of discretion, or that it exceeds the maximum reasonable penalty." J.A. 62. Nor do the parties contend that the VA indicated it would like a lesser penalty on fewer charges. Therefore, we see no

reversible error in the Board's interpretation of law or weighing of the *Douglas* factors.

Nor did the Board err in considering the notoriety of the offenses with which Mr. Robinson was charged. *Douglas* specifically recognized "the notoriety of the offense or its impact upon the reputation of the agency" as relevant to determining whether a penalty is appropriate. 5 M.S.P.B. at 332. Multiple witnesses testified that the waitlist improprieties at the heart of Mr. Robinson's charges led to "veterans falling through the cracks" and negatively impacted the reputation of the VA. J.A. 61. Because *Douglas* explicitly acknowledges as relevant the "notoriety" of the employee's misconduct and its impact on the agency, and the AJ assessed the credibility of witnesses on the issue, substantial evidence supports the Board's conclusion that "the notoriety of the offense was an aggravating factor." J.A. 61; *see also Haebe v. Dep't of Justice*, 288 F.3d 1288, 1300 (Fed. Cir. 2002) (stating deference is given to AJ's findings based on issues of demeanor-based credibility).

Substantial evidence also supports the Board's decision that Mr. Robinson did not meet his burden to show disparate treatment among similarly-situated individuals. Mr. Robinson argues that other individuals just as, if not more, culpable for the charged offenses were not removed, and therefore his removal was unreasonable. Mr. Robinson once again appears to misunderstand the allegations against him. He contends that no other supervisors in other VA medical centers suffering from scheduling issues were disciplined for negligent supervision. As discussed above, however, Mr. Robinson is charged with negligently performing his *own* duties, not for failure to supervise employees. Therefore, any "similarly-situated employees" he identified were likely not charged with similar misconduct.

The evidence also belies Mr. Robinson's argument. The Board credited Mr. Gibson's testimony that other

employees charged with similar misconduct either retired or resigned before the agency could remove them. Therefore, there was no opportunity for the VA to treat those involved inconsistently because those individuals voluntarily left the VA. The record also shows that the VA removed other managers at Phoenix VA involved in the scheduling failures, including Mr. Curry. In contrast, Mr. Robinson fails to identify as comparators particular individuals in upper management at the VA accused of similar misconduct who were not removed. *See Boucher v. U.S. Postal Serv.*, 2012 M.S.P.B. 126, ¶ 20 (2012) ("To establish disparate penalties, the appellant must show that there is 'enough similarity between both the nature of the misconduct and the other factors to lead a reasonable person to conclude that the agency treated similarly-situated employees differently.'" (quoting *Lewis v. Dep't of Veterans Affairs*, 2010 M.S.P.B. 98, ¶ 15 (2010))). He appears to only make general allegations that "he had been treated much more harshly than others in similar circumstances." Appellant Br. 52. Without more, we are unable to discern whether these other individuals are "similarly-situated employees" whose "nature of . . . misconduct and . . . other factors . . . lead a reasonable person to conclude that the" VA treated Mr. Robinson differently. *Lewis*, 2010 M.S.P.B. 98, ¶ 15.

We note that "the AJ need not consider every one of the 12 Douglas factors mechanistically by a preordained formula." *Webster v. Dep't of Army*, 911 F.2d 679, 686 (Fed. Cir. 1990) (internal quotation marks and brackets omitted). The length and detail of the Board's discussion of Mr. Robinson's misconduct throughout the remainder of the opinion is relevant to numerous *Douglas* factors, including the seriousness of the offense. We have found that this type of analysis "need not be repeated in the penalty discussion," but rather the opinion should be read as a whole. *Id.* at 688. Therefore, on this record, substantial evidence

supports the conclusion that Mr. Robinson's removal was reasonable.

D. Whistleblowing Retaliation Defense

Turning to Mr. Robinson's whistleblower retaliation defense, he contends that the VA failed to establish by clear and convincing evidence that he would have been removed regardless of his protected disclosure to Congress about Dr. Shulkin's inaccurate testimony.[4]  The question before us is whether the Board erred in finding that the VA would have removed Mr. Robinson absent his protected disclosure.  *See* 5 U.S.C. § 1221(e)(2).

To evaluate whether the VA would have taken the same action in the absence of Mr. Robinson's protected disclosure, we look at the *Carr* factors:

> the strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

*Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).  The VA need not produce evidence with regard to each of these factors, nor must each factor weigh in favor of the agency for the VA to carry its burden.  *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1374 (Fed. Cir. 2012).  Instead, we consider the record as a whole and balance the *Carr* factors to determine whether substantial evidence supports the Board's finding that the VA clearly and

---

[4]    The AJ determined that Mr. Robinson's statements to the Senate Committee were protected disclosures under 5 U.S.C. § 2302(b)(8)(A) and that these disclosures contributed to his removal.  No party disputes these findings.

convincingly proved it would have removed Mr. Robinson independent of his protected disclosures. *Miller v. Dep't of Justice*, 842 F.3d 1252, 1263 (Fed. Cir. 2016) ("*Miller DOJ*"); *see also Whitmore*, 680 F.3d at 1374 ("Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion.").

Regarding the first *Carr* factor, the Board found that the VA had strong evidence to support removal. We have already concluded that substantial evidence supports a finding that Mr. Robinson was negligent in performing his duties as Associate Director and that he failed to ensure that Phoenix VA transmitted accurate information to VISN 18. Therefore, the evidence and the first *Carr* factor strongly support the VA's decision to remove Mr. Robinson.

Turning to the second *Carr* factor, a motive to retaliate, the AJ concluded that Deputy Secretary Gibson—the Deciding Official—"did not have retaliatory motive" because Mr. Robinson's statements "targeted Shulkin, not Gibson." J.A. 48. It appears the AJ failed to consider whether Mr. Gibson had any motive to retaliate against Mr. Robinson for statements implicating the perceived ineptitude and deceit of the VA.

We have explained that

> those responsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures, and even if they do not know the whistleblower personally, as the criticism reflects on them in their capacities as managers and employees.

*Miller DOJ*, 842 F.3d at 1261–62 (quoting *Whitmore*, 680 F.3d at 1370). While Mr. Gibson may not have had a personal motive to retaliate against Mr. Robinson for contradicting Under Secretary Shulkin, the AJ did not expressly

discuss whether Mr. Gibson had a professional retaliatory motive. Mr. Robinson's statements to the Senate Committee implicated the capabilities, performance, and veracity of VA managers and employees, and implied that the VA deceived the Senate Committee. These statements occurred months before Robinson's second notice of removal. Yet the AJ appeared to dismiss wholesale Gibson's motives to retaliate. Thus, it is not clear that the evidence supports the VA for this *Carr* factor.

Nonetheless, in light of Mr. Gibson's credited testimony, the Board's conclusion that he lacked motive to retaliate is not unreasonable. In discussing Mr. Gibson's retaliatory motive (or lack thereof), the AJ incorporated by reference discussion of Mr. Robinson's due process defense. There, the AJ concluded that "Gibson was not biased." J.A. 52; *see also id.* ("I find that [Gibson] considered the record as a whole and kept an open mind."). The AJ based his conclusion on an assessment of Mr. Gibson's credibility and demeanor, relying on Gibson's testimony to conclude that Gibson (1) acknowledged that disciplinary matters affect the VA in addition to those disciplined; (2) spent a lot of time assessing the evidence against Mr. Robinson; and (3) was misquoted in the *New York Times* article where he allegedly stated removal of Phoenix VA personnel will "help VA 'move past' the wait-time scandal that has consumed the agency for nearly two years." J.A. 7187. The AJ also gave weight to the fact that Mr. Gibson did not sustain Charge 3, the whistleblower retaliation charge. Given the AJ's reliance on Mr. Gibson's testimony, the AJ did not unreasonably conclude that Mr. Gibson had no retaliatory motive, either professionally or personally. The second *Carr* factor therefore slightly favors the VA.

Finally, Mr. Robinson contends that the VA failed to provide any evidence that it treated him the same as similarly situated individuals, and that those individuals did not make protected disclosures. The Board found that there was "mixed evidence" as to whether the VA doled out

analogous discipline to similarly situated individuals. J.A. 48. For example, the VA removed Mr. Robinson's direct supervisor, Ms. Helman, the Director of Phoenix VA; Dr. Deering, Chief of Staff; and Mr. Robinson's direct subordinate, Mr. Curry, Chief of HAS. Helman and Curry were similarly situated individuals, having supervisory positions at Phoenix VA and responsible for overseeing scheduling issues. *See Carr*, 185 F.3d at 1326–27 ("For an employee to be considered similarly situated to an individual who is disciplined, it must be shown that the conduct and the circumstances surrounding the conduct of the comparison employee are similar to those of the disciplined individual."). The AJ weighed the removal of Helman, Deering, and Curry against Robinson's assertion that individuals at other VA centers were not removed despite their scheduling improprieties. Based on the entirety of the evidence, the AJ concluded that this factor "neither helps nor hurts the agency's case." J.A. 49.

Indeed, the AJ did not affirmatively conclude that Helman, Deering, and Curry were similarly situated. Nor did he conclude that these individuals had not made protected disclosures. Similarly, the AJ did not affirmatively state that VA personnel at other agency centers suffering from scheduling mishaps were similarly situated. Instead, the AJ presumed that all individuals considered under this factor—Helman, Deering, Curry, and VA personnel identified by Mr. Robinson—were "non-whistleblowers." J.A. 48 (stating "and which I assume, without deciding, involved non-whistleblowers."). Likewise, it appears that the AJ assumed everyone identified in relation to this factor was treated similarly to Mr. Robinson. This mixed record causes the last *Carr* factor to be neutral. Accordingly, it was not unreasonable for the AJ to count it as neutral.

In considering the evidence in the aggregate, including the strength of *Carr* factor one, the Board's conclusion that the VA met its clear and convincing burden was supported by substantial evidence.

### E.   Due Process

We next turn to Mr. Robinson's procedural due process arguments.  Mr. Robinson does not dispute that he received notice of the charges against him.  Nor does he argue that the VA's notice of removal was deficient in any way.  Instead, Mr. Robinson contends that Mr. Gibson and the VA violated Robinson's due process rights by determining his termination before he had the opportunity to respond to the second notice of proposed removal.  He argues that Mr. Gibson's *New York Times* statements, other public statements presupposing the removal of VA officials, and the fact that Gibson was both the Proposing Official and Deciding Official all show that "Robinson's removal was a foregone conclusion."  Appellant Br. 26.  Mr. Robinson also contends that the AJ erred when he failed to assess all the evidence showing that Mr. Gibson and the VA were intent on removing Robinson from the outset, or at the very least, gave the appearance of having already predetermined the outcome.

One of the fundamental requirements of due process is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (emphasis in original) (quoting *Boddie v. Conn.*, 401 U.S. 371, 379 (1971)).  This requirement may be fulfilled by "some kind of a hearing."  *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 570 n.7 (1972)).  In other instances, the requirement may be satisfied by an opportunity to respond. *Id.*; *see also id.* at 546 ("The essential requirements of due process . . . are notice and an opportunity to respond.").

We have stated that public employees in Mr. Robinson's position have a property interest in their continued employment.  *Stone v. F.D.I.C.*, 179 F.3d 1368, 1374–75 (Fed. Cir. 1999) (collecting cases).  As a public employee, Mr. Robinson was therefore entitled to an opportunity to be heard prior to any decision of removal.  But the record appears to indicate that Mr. Robinson was not afforded an

opportunity to respond to the second notice of removal before public statements regarding his termination were made.

Statements credited to Mr. Gibson in the *New York Times*, for example, are greatly troublesome.  The article describes Gibson as disappointed that it took so long to remove Robinson, Deering, and Curry, who presumably are responsible for a "national scandal . . . over secret waiting lists and unnecessary deaths."  J.A. 7186.  The March 15, 2016 article and Mr. Gibson's alleged statements paint a picture showing Mr. Robinson to be responsible, in part, for the "wait-time scandal" and that Mr. Gibson made up his mind about Robinson's guilt before he was served with the second proposal of removal on March 16, 2016.  Thus, it appears that Gibson publicly announced Robinson's termination before Robinson even knew about the proposed removal.  The public statements about Robinson and his removal would appear on their face to violate Mr. Robinson's due process rights.

While Mr. Gibson's alleged *New York Times* statements are troubling, the AJ credited Mr. Gibson's testimony that he was misquoted by the article's author.  The AJ also relied on Mr. Gibson's testimony that "he did not predetermine the outcome of the case" and that Gibson gave the evidence "a lot of deliberation."  J.A. 52.  Other than general accusations of bias, Mr. Robinson does not contend that Mr. Gibson is untruthful or that his testimony is otherwise impeachable.  As discussed above, the AJ thought Gibson to be a credible witness and we will not disturb findings relying on Gibson's testimony.  *See Chauvin v. Dep't of Navy*, 38 F.3d 563, 566 (Fed. Cir. 1994) (stating a finding based on the demeanor of a witness, whether expressly or implicitly, cannot be overturned without "articulated sound reasons" (citing *Jackson v. Veterans Admin.*, 768 F.2d 1325, 1331 (Fed. Cir. 1985))).

Mr. Robinson contends that other occurrences indicate that he did not receive the pretermination consideration he is entitled to under the Due Process Clause. For instance, Mr. Robinson contends that political pressure and public assurances that those responsible at the VA would be removed indicate that Robinson was guaranteed to be removed from the outset. Mr. Robinson also argues that the fact that Mr. Gibson replaced Kevin Hanretta as Deciding Official shows the VA's effort to ensure a preferred outcome. Finally, Mr. Robinson contends that Mr. Gibson exhibited his pretermination bias by accusing Robinson of whistleblower retaliation (Charge 3) even though the same charge was previously rejected by the Board in a different case. We address each of these in turn.

First, the Board addressed and dismissed Mr. Robinson's "political pressure" argument because statements made by the President and Congress only promised disciplinary action if misconduct was found. No political entity required removal prior to an opportunity to be heard.

Second, we have previously noted that "[a]t the pre-termination stage, it is not a violation of due process when the proposing and deciding roles are performed by the same person." *DeSarno v. Dep't of Commerce*, 761 F.2d 657, 660 (Fed. Cir. 1985); *see also Holton v. Dep't of Navy*, 884 F.3d 1142, 1150 (Fed. Cir. 2018). Thus, the fact that Mr. Gibson was both the proposing official and the deciding official does not show that Mr. Robinson did not receive pretermination due process.

Third, Mr. Gibson's discussion of Charge 3 in the Decision Regarding Proposed Removal shows that he took into consideration Mr. Robinson's response to the second notice of proposed removal. Mr. Robinson's written response to the removal allegations is dated April 20, 2016, and addresses all specifications to Charge 3 (the whistleblower retaliation charge). Mr. Gibson's removal decision is dated June 7, 2016. In the Decision Regarding Proposed

Removal, Mr. Gibson stated he was persuaded by Robinson's explanation of one of the specifications, and as a result, did not sustain that particular specification to Charge 3. Therefore, based on this record, it is not unreasonable to conclude that Mr. Gibson fully considered Mr. Robinson's response prior to deciding his removal. *See Loudermill*, 470 U.S. at 545–46 (stating a pretermination opportunity to respond "should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."); *accord Hodges v. U.S. Postal Serv.*, 2012 M.S.P.B. 116, ¶ 6 (2012) ("We find the deciding official's complete failure to consider the appellant's written response to the proposal notice before issuing a decision constitutes—in and of itself—a violation of minimum due process law.").

In any event, Mr. Robinson's implication that Charge 3 could not have been brought at all in the face of the Board's prior decision is incorrect. The AJ relied on collateral estoppel to reject only one of the five other specifications to Charge 3. The remaining specifications were not sustained due to alternate grounds. Thus, the fact that Mr. Gibson sustained Charge 3 on the remaining specifications notwithstanding Mr. Robinson's written response is no indication of a due process violation or that Mr. Robinson's removal was a foregone conclusion.

Mr. Robinson clearly had notice and a pretermination opportunity to be heard. His response swayed Mr. Gibson to dismiss one of the original Charge 3 specifications. Mr. Robinson therefore had a meaningful opportunity to respond prior to his disciplinary action. *See Loudermill*, 470 U.S. at 546 ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."). We see no error in the Board's conclusion that Mr. Robinson failed to show that his removal was predetermined. *See id.*

(stating that to require more than notice of the charges, an explanation of the evidence, and an opportunity to be heard "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.").

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Board.

## **AFFIRMED**

## COSTS

No costs.