NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CRANDALL GRIFFIN,**
*Petitioner*

**v.**

**DEPARTMENT OF THE NAVY,**
*Respondent*

---

2018-2072

---

Petition for review of the Merit Systems Protection Board in No. DC-0752-17-0169-I-1.

---

Decided: December 26, 2019

---

KEVIN EDWARD BYRNES, FH+H, PLLC, Tysons, VA, argued for petitioner. Also represented by RACHEL LEAHEY.

SONIA W. MURPHY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by JOSEPH H. HUNT, ELIZABETH MARIE HOSFORD, ROBERT EDWARD KIRSCHMAN, JR.

---

Before LOURIE, REYNA, and WALLACH, *Circuit Judges.*

REYNA, *Circuit Judge.*

Crandall Griffin, a criminal investigator with the Naval Criminal Investigative Service, was suspended and demoted after the Navy revoked his driving privileges and charged him with Conduct Unbecoming a NCIS Senior Manager. He appealed the Navy's decision to the Merit Systems Protection Board. The Board affirmed the Navy's decision to demote Griffin. On appeal, Griffin asserts that the Navy failed to establish a nexus between his conduct and the "efficiency of service"—i.e., that the Navy failed to show Griffin's conduct had an adverse effect on his performance, on the mission of the Navy, or on the Navy's trust and confidence in him. Griffin also challenges the Navy's penalty as unreasonable. Because the Navy's nexus finding is supported by substantial evidence, and because the Board did not abuse its discretion in determining that the Navy's punishment of Griffin was reasonable, we *affirm*.

BACKGROUND

I. The Naval Criminal Investigative Service

In 2016, Crandall Griffin ("Griffin") was a criminal investigator with the Naval Criminal Investigative Service ("NCIS") in Japan. As Assistant Special Agent in Charge, Griffin was the second-highest ranking NCIS official in Japan. The NCIS is a federal law enforcement agency that:

> protects and defends the [Navy] against terrorism and foreign intelligence threats, investigates criminal offenses, enforces the criminal laws of the United States and the [Uniform Code of Military Justice] . . . and provides law enforcement and security services to the Navy and Marine Corps on a worldwide basis.

J.A. 493.

The Secretary of the Navy relies on all NCIS agents for "prompt investigative action" including "effective

investigation and resolution of alleged, suspected, or actual criminal offenses, terrorist or intelligence threats, and security compromises." J.A. 485. NCIS agents are expected to respond "immediately, independently, and capably." J.A. 1815. NCIS agents are required to respond to emergencies during and after work hours. J.A. 1868. As a result, the ability to drive a motor vehicle is an "essential job function" and all NCIS agents are required to possess a valid driver's license.

## II. Loss of Driving Privileges

Upon arriving in Japan, Griffin underwent a driver's training course and obtained a Department of Defense driver's license ("DOD driver's license"). The DOD driver's license was required for Griffin to operate a motor vehicle in Japan. The DOD driver's license was also required for Griffin to operate a motor vehicle on any military installation—whether in Japan, the United States, or elsewhere in the world.

As part of his driver's training course, Griffin learned that the accumulation of multiple driving-related tickets could result in revocation of his driving privileges. J.A. 1809. Navy Instructions also describe this policy: "[a]ccumulation of 12 points within 12 consecutive months or 18 points within 24 consecutive months will result in revocation of driving privileges for a minimum of one year." Commander of Fleet Activities for the Department of the Navy Instruction ("COMFLEACTINST") 5800.2G. J.A. 402.

While serving in Japan, Griffin accumulated numerous traffic violations. During the two-year period from 2014 to 2016, Griffin accumulated 18 traffic infraction points from seven separate traffic violations. J.A. 276. Griffin's violations included four speeding violations, a traffic accident, disobeying a traffic sign, and illegal parking. *Id.* Griffin committed traffic violations both on-base and off-base, while on-duty and off-duty, and while driving his personal vehicle and an NCIS vehicle. *Id.* On May 5, 2016, the Navy

revoked Griffin's DOD driver's license pursuant to COMFLEACINST 5800.2G. Without his DOD driver's license, Griffin was not authorized to operate a motor vehicle in Japan or on any military installations, worldwide.

On July 27, 2016, shortly after Griffin lost his driving privileges, the Navy charged Griffin with Conduct Unbecoming a NCIS Senior Manager. The Navy proposed a 10-day suspension without pay and a demotion in paygrade from a GS-14/4 to a GS-13/5. Special Agent John Freeman ("Proposing Official Freeman") explained that, as a consequence of Griffin's accumulation of 18 traffic infraction points and his resultant loss of driving privileges, "multiple accommodations and work-arounds were necessary to permit [Griffin] to perform [his] duties [in Japan] on a daily basis." J.A. 41. Proposing Official Freeman also explained that, once Griffin was relocated to Navy Headquarters in Washington, DC, "the revocation of [his] installation driving privileges will limit [his] ability to respond to all duty stations within [his] geographic area and could negatively affect [his] ability to perform [his] duties as a NCIS special agent and senior manager." *Id.* Griffin would later concede that the revocation of his driving privileges "obviously affect[ed] [his] ability to perform [his] official duties." J.A. 1292.

On November 28, 2016, Executive Assistant Director for Pacific Operations Andrew P. Snowdon ("Deciding Official Snowdon") sustained the proposed ten-day suspension. Deciding Official Snowdon found that Griffin's conduct was unbecoming an NCIS Senior Manager because Griffin's "multiple traffic violations, which resulted in the revocation of [his] driving privileges, demonstrated poor judgment and decision-making which are not congruent with expectations of senior NCIS management." J.A. 50. Although Deciding Official Snowdon agreed that a paygrade demotion was appropriate, he set Griffin's paygrade at GS-13/09 after concluding that the initially proposed demotion

to a GS-13/05 "would result in too significant a monetary loss." J.A. 50.

Before the demotion took effect, however, NCIS's human resources office notified Deciding Official Snowdon that Navy policy precluded him from setting the demotion at GS-13/09, and that Griffin's paygrade could be set no higher than GS-13/07. After receiving that notice, Deciding Official Snowdon determined that suspending Griffin for 10 days and demoting him to a GS-13/07 was a reasonable penalty. Deciding Official Snowdon also reaffirmed his finding that "a demotion and suspension are necessary to promote the efficiency of service and to deter future misconduct." J.A. 530. On January 22, 2017, Griffin was demoted to a GS-13/07.

### III. Merit Systems Protection Board

On November 29, 2016, Griffin appealed the demotion to the Merit Systems Protection Board ("Board"). Griffin did not dispute the conduct that led to his demotion. Instead, he argued that the Navy had not proven a nexus between his misconduct and the efficiency of service, and that the Navy's penalty was unreasonable. The Board rejected both arguments.

The Board found that the Navy had demonstrated a nexus in two separate ways. First, the Board found that Griffin's conduct—namely his "repeated disregard of the law in incurring so many traffic violations in such a short period of time that his license was revoked"—reflected poorly on the agency and its law enforcement mission. J.A. 4. Second, the Board determined that Griffin's repeated disregard for the law "hampered [his] ability to perform his duties" and caused his superiors to lose trust and confidence in Griffin as a law enforcement officer, as a supervisor, and as a senior leader at NCIS. *Id.*

In affirming the Navy's penalty as reasonable, the Board opined that: (i) Deciding Official Snowdon had

properly considered the *Douglas* factors; (ii) Griffin had repeatedly received notice about the consequences of his disregard for the law; (iii) Japan was a "sensitive assignment" because of widely publicized violations of the law involving U.S. military personnel in Japan; and (iv) Griffin "fail[ed] to recognize the obvious and unfavorable discrepancy between his role as a supervisory law enforcement officer and his repeated violations of the law." J.A. 6–8.

The Board also found "nothing improper" in Deciding Official Snowdon's consideration of "impact statements" from Special Agent in Charge Marc Blincoe (Griffin's supervisor in Japan) or Special Agent Daniel D'Ambrosio (Griffin's supervisor after he returned to the United States). J.A. 9. Instead, the Board determined that consideration of impact statements is standard practice when, like here, decision-makers at headquarters are reviewing adverse actions by employees in the field.

The Board likewise determined that the Navy did not err when, in accordance with HR policy, Deciding Official Snowdon corrected Griffin's paygrade demotion to a GS-13/7 instead of a GS-13/9. The Board noted that, even as corrected, the demotion ordered by Deciding Official Snowdon was less severe than the demotion proposed by Proposing Official Freeman. The Board also noted that Griffin was provided an opportunity to respond to Deciding Official Snowdon's corrected paygrade demotion, but he declined to do so.

Griffin timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

We review Board decisions to determine whether the decision is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law; or (3) unsupported by

substantial evidence. 5 U.S.C. § 7703(c); *Hayes v. Dep't of Navy*, 727 F.2d 1535, 1537 (Fed. Cir. 1984).

We review the Board's nexus findings for substantial evidence. *Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000) ("Absent a mistake of law by the Board in selecting the proper test for analyzing the nexus requirement, we must uphold the Board's nexus finding if it is supported by substantial evidence.") *Id.* We thus uphold a Board nexus finding if the record discloses such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached. *Hayes*, 727 F.2d at 1537.

We defer to the Navy's choice of penalty unless "the penalty exceeds the range of permissible punishment specified by statute or regulation, or unless the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Archuleta v. Hopper*, 786 F.3d 1340, 1352-53 (Fed. Cir. 2015) ("The determination of an appropriate penalty is a matter committed primarily to the sound discretion of the employing agency."). This principle of deference reflects the important policy consideration that the employing agency is in the best position to judge the impact of the employee misconduct upon the operations of the agency. *Id.*

## I. Nexus

The Navy may take adverse action against an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). To satisfy that requirement, the Navy must show by preponderant evidence that a nexus exists between the misconduct and the work of the agency, i.e., that the employee's misconduct is likely to have an adverse impact on the agency's performance of its functions. *Brown*, 229 F.3d at 1358. The Navy may establish a nexus by showing that the employee's conduct: (i) affected his or her coworkers' job performance; (ii) affected management's trust and confidence in the employee's job

performance; or (iii) adversely affected the agency's mission.

Here, the Board found a nexus on the basis that Griffin's conduct adversely affected the agency's mission and affected management's trust and confidence in his job performance. We uphold each finding as supported by substantial evidence.

There is no dispute that part of NCIS's mission is to enforce the law. J.A. 493. Multiple witnesses testified that Griffin's conduct, as a law enforcement officer and supervisor of the NCIS, adversely affected that mission by repeatedly showing a disregard for the law. J.A. 117, J.A. 1706, J.A. 1731, J.A. 1788. As Deciding Official Snowdon explained:

> [T]here is an expectation that a senior law enforcement officer will obey laws of a host nation. When you failed to meet this expectation and, as the second highest ranking NCIS representative in Japan, had your driving privileges revoked, this caused embarrassment for the agency and reflected poorly on NCIS as a law enforcement organization.

J.A. 117. Griffin conceded that individuals inside and outside of NCIS became aware of his conduct, including Japanese police.

Substantial evidence also supports the Board's finding that Griffin's conduct affected management's trust and confidence in his job performance. While Griffin received "superlative" performance appraisals during his time in Japan, J.A. 335, witnesses testified that NCIS management lost trust and confidence in Griffin's ability to perform his job satisfactorily following the revocation of his DOD license. *See* J.A. 1702–1705 ("I just wasn't confident that after that period of time that successful and positive decisions would be made moving forward."). *See also* J.A. 1787–1788 ("To have someone in that position that

disregards laws, regulations, rules and repeatedly fails to correct their behavior when addressed during court proceedings or, in this case, even in the Japanese judicial system, is not in keeping with what we expect of our senior managers within NCIS."). Moreover, witnesses testified that "multiple accommodations and work-arounds were necessary to permit [Griffin] to perform his duties on a daily basis." J.A. 189.

On the basis of this record, we conclude that substantial evidence supports the Board's findings that Griffin's conduct affected the agency's mission adversely and management's trust and confidence in Griffin's job performance. *See Hayes*, 727 F.2d at 1537. Thus, substantial evidence supports the Board's conclusion that the Navy established a nexus between Griffin's misconduct and the work of the agency.

## II. Penalty

Agencies are directed to consider the twelve so-called "*Douglas* factors" when determining whether a penalty is reasonable. *Robinson v. Dep't of Veterans Affairs*, 923 F.3d 1004, 1016 n.3 (Fed. Cir. 2019) (*citing Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 332 (1981)). "Not all of these factors will be pertinent in every case," *Douglas*, M.S.P.B. 332, and "an agency is required only to consider those factors relevant to the action." *Bryant v. National Science Found.*, 105 F.3d 1414, 1418 (Fed. Cir. 1997). The Board's role in reviewing the agency's *Douglas* analysis is "not to insist that the balance be struck precisely where the Board would choose to strike it if the Board were in the agency's shoes in the first instance . . . [but instead] to assure that the agency did conscientiously consider the relevant factors and did strike a responsible balance within tolerable limits of reasonableness." *Douglas*, M.S.P.B. 332–333.

Griffin argues that the Board abused its discretion by evaluating the *Douglas* factors using factual findings that are not supported by substantial evidence. Appellant Br.

45–63. We disagree. The Navy and the Board properly considered the pertinent *Douglas* factors, and Griffin has not shown that the Navy's choice of penalty exceeds the range of permissible punishments provided by law, nor has Griffin shown that the penalty is "so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Archuleta v. Hopper*, 786 F.3d 1340, 1352-53 (Fed. Cir. 2015). As a result, we affirm the Board's conclusion that the Navy's penalty was reasonable.

## III. Bias

Griffin argues that the Board abused its discretion by ignoring certain arguments and evidence, by considering evidence "outside the charge" of the decision, and by interpreting Navy requirements "against" Griffin's interests. *E.g.*, Appellant Br. 28, 56; Appellant Reply Br. 11, 12, 27. For support, Griffin points to, among other things, the way AJ Clement characterized Griffin's assertions. Specifically, Griffin argues that the AJ "issued an intemperate opinion that largely denigrated SA Griffin and failed to adequately consider the essential legal issues germane to such an action." Appellant Br. 3.

We note that AJ Clement described Griffin's arguments as "preposterous," "laughable," and "completely unconvincing." J.A. 5–7. While we disagree that the Board decision is erroneous, we find the language unnecessary and bordering on disrespect, and contrary to the role of administrative judges as neutral arbiters.

Judicial impartiality is a cornerstone of due process. MODEL CODE OF JUDICIAL CONDUCT Canon 1 (Am. Bar Ass'n 2011). The rule of law depends on public confidence in the integrity and independence of those administering the law. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). The language used by AJ Clement has the potential of conveying to the public a lack of impartiality, a lack of open-mindedness, and a lack of reasoned decision-making. We caution AJ Clement and all

other AJs to refrain from the use of such language in the future.

## CONCLUSION

We have considered Griffin's other arguments and find them unpersuasive. We conclude that substantial evidence supports the Board's conclusion that the Navy established a nexus between Griffin's misconduct and the work of the agency. We also conclude that the Board did not abuse its discretion in determining that the Navy's penalty against Griffin is reasonable. We affirm.

## **AFFIRMED**

### COSTS

No costs.