# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

DRENTH AND HACKSTALL
    CONSOLIDATION,

          Appellant,

      v.

DEPARTMENT OF HOMELAND
    SECURITY,

          Agency.

DOCKET NUMBER
DC-0752-17-0418-I-1

DATE:  December 23, 2024

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Kristin Alden, Esquire, and Ross Fishbein, Esquire, Washington, D.C.,
    for the appellants.

Agatha Swick, Esquire, Atlanta, Georgia, for the agency.

Carley D. Bell, Esquire, Arlington, Virginia, for the agency.

Michael W. Gaches, Esquire, Springfield, Virginia, for the agency.

## BEFORE

Cathy A. Harris, Chairman
Raymond A. Limon, Vice Chairman
Henry J. Kerner, Member

---

[1]  A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

**FINAL ORDER**

The appellants have filed a petition for review of the initial decision, which affirmed their removals. Generally, we grant petitions such as this one only in the following circumstances: the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioners' due diligence, was not available when the record closed. Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, we conclude that the petitioners have not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review. Except as expressly MODIFIED to provide a more thorough analysis regarding the appellants' whistleblower reprisal affirmative defense and to apply our recent decision in *Young v. Department of Homeland Security*, 2024 MSPB 18, we AFFIRM the initial decision.

**BACKGROUND**

Appellant Drenth was employed by the agency as a Program Analyst, SV-0343-I, in the Office of Security Capabilities (OSC), Deployment and Logistics Division (DLD). *Drenth and Hackstall Consolidation v. Department of Homeland Security*, MSPB Docket No. DC-0752-17-0418-I-1, Consolidation Appeal File (CAF), Tab 2 at 39. Appellant Hackstall was employed as a Program Specialist, SV-0301-J, in the same office.[2] *Id.* at 41. On or about March 9, 2015, the agency's Office of Investigations (OOI) began investigating both of the

---

[2] Drenth's position is equivalent to a GS-13 position, and Hackstall's position is equivalent to a GS-14 position. CAF, Tab 2 at 9.

appellants' use of the agency's internal instant message (IM) system, and on May 6, 2015, OOI issued a report of investigation (ROI), which reviewed and analyzed thousands of IMs sent between the appellants. CAF, Tabs 77, 78.

On October 16, 2015, the agency's Office of Professional Responsibility (OPR) proposed Drenth's removal based on one charge of misuse of a Government computer system (168 specifications) and one charge of unprofessional conduct (one specification). CAF, Tab 76 at 6-26. Charge one was based on allegations that the appellant used his Government-issued computer to send IMs that contained inappropriate comments to and about other agency employees. *Id.* Charge two was based on allegations that, during a training course, he ignored the instructor when the instructor attempted to engage him and was on his cell phone rather than participating in the course. *Id.* at 25.

On January 14, 2016, OPR proposed Hackstall's removal on one charge of misuse of a Government computer system (203 specifications). CAF, Tab 75 at 6-24. The charge was based on allegations that he used his Government-issued computer to send IMs that contained inappropriate comments to and about other agency employees.[3] *Id.* at 7. By letters dated February 14, 2017, and February 15, 2017, Hackstall and Drenth, respectively, received final decisions on the proposed actions, which removed them from Federal service. CAF, Tab 2 at 44-96.

Both appellants appealed to the Board. *Drenth v. Department of Homeland Security*, MSPB Docket No. DC-0752-17-0387-I-1, Initial Appeal File, Tab 1; *Hackstall v. Department of Homeland Security*, MSPB Docket No. DC-0752-17-0386-I-1, Initial Appeal File, Tab 1. Their cases were consolidated under *Drenth and Hackstall Consolidation v. Department of Homeland Security*, MSPB Docket No. DC-0752-17-0418-I-1. CAF, Tab 1. Drenth denied the allegations contained

---

[3] Due to the offensive and disrespectful nature of the IMs, we will not recite them here. Rather, a full compilation can be found in the record. CAF, Tab 75 at 7-24, Tab 76 at 7-23. A summary of the IMs can also be found in the initial decision. CAF, Tab 86, Initial Decision (ID) at 8-13.

in the unprofessional conduct charge, but neither appellant disputed the misuse of a Government-issued computer charge. CAF, Tab 49 at 3. Both appellants argued that the penalty of removal was unreasonable and asserted as an affirmative defense, among others, that the investigation into the alleged misconduct and their subsequent removals were taken in retaliation for whistleblowing activity. CAF, Tab 27 at 24-38, 42-48.

A 4-day hearing was held, CAF, Tabs 66, 69-71, after which the administrative judge issued an initial decision finding that the agency proved its charges against both appellants by preponderant evidence. CAF, Tab 86, Initial Decision (ID) at 5-19. She also found that the appellants failed to establish their affirmative defenses and that the penalty of removal was reasonable and promoted the efficiency of the service. ID at 19-52.

The appellants have filed a petition for review, and the agency has filed a response, to which the appellants have replied. *Drenth and Hackstall Consolidation v. Department of Homeland Security*, MSPB Docket No. DC-0752-17-0418-I-1, Petition for Review (PFR) File, Tabs 5, 11, 14.

## DISCUSSION OF ARGUMENTS ON REVIEW

In the appellants' petition for review, they do not argue that the agency failed to prove the charge of misuse of a Government-issued computer.[4] Rather,

---

[4] In the petition for review, Drenth argues that the agency failed to prove the charge of unprofessional conduct. PFR File, Tab 5 at 45-47. In finding that the agency proved this charge, the administrative judge relied on witness testimony from, among others, coworkers who also attended the training, and on a written statement provided by the instructor. ID at 13, 15-18; CAF, Tab 78 at 514. After assessing the witness testimony and the instructor's written statement, the administrative judge found that the agency proved by preponderant evidence that Drenth engaged in unprofessional conduct during the training session as charged. ID at 19. On review, Drenth argues that the administrative judge erred in her weighing of the testimony and that her credibility determinations ignored factual errors. PFR File, Tab 5 at 45-46. We have carefully reviewed the record, and although the administrative judge did not explicitly reference the witnesses' demeanor, we afford her credibility-based factual findings deference. *Purifoy v. Department of Veterans Affairs*, 838 F.3d 1367, 1373 (Fed. Cir. 2016) (explaining that the Board must give deference not only to an administrative judge's

the appellants argue that the administrative judge erred in her analysis of their whistleblower reprisal affirmative defense, that she misapplied the law when she found the penalty of removal to be reasonable, and that she abused her discretion when she denied their motion for sanctions. PFR File, Tab 5 at 20-52.

<u>We supplement the administrative judge's discussion of the appellants' whistleblower reprisal affirmative defense, but still find that the agency met its burden to show by clear and convincing evidence that it would have taken the same actions absent the appellants' whistleblowing.</u>

As noted, the appellants raised an affirmative defense of, among other things, whistleblower reprisal. CAF, Tab 27 at 24-38, 42-48. To establish this affirmative defense, they must show by preponderant evidence that they made a protected disclosure under 5 U.S.C. § 2302(b)(8) or engaged in protected activity under 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D), and that the disclosure or activity was a contributing factor in a personnel action. 5 U.S.C. § 1221(e); *Covington v. Department of the Interior*, 2023 MSPB 5, ¶ 15. If they establish this prima facie case, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same action in the absence of the appellants' whistleblowing. *Covington*, 2023 MSPB 5, ¶ 45.

> *We agree that the appellants established a prima facie case of whistleblower reprisal with respect to their removals.*

Here, Drenth asserted that, during a January 21, 2015 meeting with his fourth- and fifth-line supervisors, (the OSC Deputy Assistant Administrator and OSC Assistant Administrator, respectively), he expressed concern that his third-line supervisor, the DLD Director, was engaging in personnel practices that amounted to violations of merit systems principles, an abuse of authority

---

credibility findings that explicitly rely on witness demeanor, but also to those that are "intertwined with issues of credibility and an analysis of [a witness's] demeanor at trial"). Drenth's recitation of the evidence on review does not persuade us otherwise. PFR File, Tab 5 at 45-47; *see Broughton v. Department of Health and Human Services*, 33 M.S.P.R. 357, 359 (1987) (observing that mere reargument of factual issues already raised and properly resolved by the administrative judge does not establish a basis for review).

regarding selection and hiring processes, and inappropriate use of Government funds relating to a Government contractor. CAF, Tab 27 at 8. It is undisputed that, following the meeting, Drenth's fourth-line supervisor met with the third-line supervisor to discuss the allegations. ID at 25; CAF, Tab 40 at 15-16.

Both Drenth and Hackstall also have alleged that they raised concerns with multiple agency officials regarding a coworker's abuse of official travel. CAF, Tab 27 at 13-14. In a March 26, 2015 email sent by the appellants' first-line supervisor (the East Region Branch Manager) to their second-line supervisor (the DLD Deputy Director) and their third-line supervisor documenting their concerns, the first-line supervisor indicated that "the appellants were alleging that agency officials were 'all committing fraud by allowing [a coworker] to get away with all this travel.'" CAF, Tab 41 at 5. Additionally, Hackstall separately alleged that he engaged in protected activity when he submitted a statement in support of Drenth after the agency proposed Drenth's removal. CAF, Tab 27 at 7. Both appellants asserted that their alleged protected disclosures and activities were contributing factors in their removals. *Id.* at 24, 43.

It is undisputed that both appellants' removals are personnel actions under 5 U.S.C. § 2303(a)(2)(A)(iii). Moreover, the administrative judge correctly found that Drenth had a reasonable belief that he was making protected disclosures regarding his third-line supervisor during the January 21, 2015 meeting.[5] ID

---

[5] Drenth also asserted that, during a February 4, 2015 meeting, his third-line supervisor discussed hiring decisions, and that he objected to the supervisor's process. CAF, Tab 27 at 9-11, 24-25. Drenth claimed that his objections constituted protected disclosures. *Id.* The administrative judge found that, based on the testimony from Drenth and his third-line supervisor, it did not appear that Drenth made any actual protected disclosures during the meeting, and that the concerns he alleged were raised at the February 4, 2015 meeting were likely the same disclosures made during the January 21, 2015 meeting. ID at 26-27. Drenth argues on review that the hearing testimony showed that the third-line supervisor, at a minimum, perceived him to be a whistleblower based on the issues he raised at the February 4, 2015 meeting and that, therefore, the administrative judge erred in her conclusion. PFR File, Tab 5 at 21-22. We have reviewed the record and it does not appear that the appellant made any new disclosures in the February 4, 2015 meeting that were not already made in the

at 25-28. Drenth's disclosures regarding his third-line supervisor's alleged handling of the selection and hiring process for a certain position and the use of Government funds related to a Government contractor constitute a reasonable belief in a disclosure of a violation of law, rule, or regulation, and an abuse of authority, and are thus protected under 5 U.S.C. § 2302(b)(8)(A)(i), (ii). Further, the administrative judge correctly found that, even if both of the appellants' allegations regarding a coworker's abuse of official travel amounted only to a disagreement about how he performed his duties and did not rise to the level of a protected disclosure, the agency still could have perceived the appellants as whistleblowers due to their first-line supervisor's email stating that the appellants were alleging fraud. ID at 31-32. The first-line supervisor's reference to "fraud" suggests that she believed the appellants were disclosing what they believed to be a violation of law, rule, or regulation. Under such circumstances, the appellants are entitled to the protection of the whistleblower statutes. *See Rumsey v. Department of Justice*, 120 M.S.P.R. 259, ¶ 7 (2013) (explaining that the critical factor in determining whether an appellant is perceived to be a whistleblower is whether the relevant agency officials believed that the appellant made disclosures, and that an appellant who makes such a showing is entitled to the protections of the whistleblower statutes). Finally, the administrative judge appropriately concluded that Hackstall's statement in support of Drenth following Drenth's proposed removal constituted protected activity under 5 U.S.C. § 2302(b)(9)(B). ID at 32. Accordingly, we agree that the appellants made protected disclosures, were perceived as whistleblowers, and engaged in protected activity.

Turning to the contributing factor element, an appellant can show contributing factor through the knowledge/timing test, which looks to circumstantial evidence such as evidence that the official taking the personnel

---

January 21, 2015 meeting. Accordingly, we agree with the administrative judge's conclusions.

action knew of the disclosure and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *Covington*, 2023 MSPB 5, ¶ 43. As the administrative judge correctly noted, Drenth raised his whistleblower reprisal claim in his reply to the proposed removal. ID at 30; CAF, Tab 2 at 278-326. In that reply, he specifically references his disclosures regarding the third-line supervisor's alleged handling of the selection and hiring process for a certain position and the use of Government funds related to a Government contractor, and his concerns regarding a coworker's alleged abuse of official travel. CAF, Tab 2 at 282-84. Thus, we agree with the administrative judge that the deciding official knew of the appellant's protected and perceived disclosures and issued the decision removing him approximately 15 months later, thereby meeting the knowledge/timing test and establishing the contributing factor element. *See Mastrullo v. Department of Labor*, 123 M.S.P.R. 110, ¶ 21 (2015) (finding that a personnel action taken within 1-2 years of an appellant's disclosure or activity satisfies the timing component of the knowledge/timing test).

Regarding Hackstall, the administrative judge found that, due to the timing of his proposed removal and the fact that it appeared to have been initiated after he engaged in protected activity, he proved by preponderant evidence that his protected activity was a contributing factor in his removal. ID at 32-33. We also note that Hackstall similarly asserted whistleblower reprisal in his reply to his notice of proposed removal and explicitly referenced his statement of support of Drenth in making that claim and his status as a perceived whistleblower. CAF, Tab 2 at 113. Thus, the deciding official was aware of his protected activity and perceived whistleblower status and issued the decision to remove him approximately 1 year later. Accordingly, Hackstall also met the knowledge/timing test. *See Mastrullo*, 123 M.S.P.R. 110, ¶ 21. We therefore agree with the administrative judge that Hackstall also established the

contributing factor element. ID at 32. Based on the foregoing, we agree with the administrative judge that the appellants established a prima facie case of whistleblower reprisal.

> *We supplement the initial decision to address the appellants' claims of a retaliatory investigation as a distinct claim and find that they also made a prima facie case of whistleblower reprisal in that regard.*

As noted, the removal actions at issue in this appeal originate from an investigation into the appellants' alleged misconduct, which began on or around March 9, 2015. CAF, Tab 77 at 9. In addition to a traditional whistleblower reprisal claim such as the one discussed above, Drenth and Hackstall also argued that the investigations into their conduct were retaliatory. CAF, Tab 27 at 6, 36. Specifically, they allege that their first-, third-, and fifth-line supervisors, as well as the Director of Mission Support, "orchestrated" the investigations that resulted in their removals. CAF, Tab 27 at 29, 44.

In the initial decision, the administrative judge considered potential retaliatory motives on the part of several of the appellants' supervisors, to the extent they were involved in initiating the underlying investigation, in determining whether the agency met its burden to show by clear and convincing evidence that it would have removed the appellants in the absence of their whistleblowing activity. ID at 37-43. However, the Board has recognized a retaliatory investigation claim as a distinct whistleblower reprisal claim requiring an independent analysis. *See Young*, 2024 MSPB 18, ¶¶ 22-24. Therefore, we address the appellants' retaliatory investigation claim separately.[6]

To establish a whistleblower reprisal claim based on an alleged retaliatory investigation, an appellant must show that the investigation was so closely related

---

[6] Much of the appellants' petition for review argues that the initial decision did not adequately address their claim of a retaliatory investigation. PFR File, Tab 5. Because we apply the analytical framework articulated in our recent decision in *Young*, 2024 MSPB 18, we have not explicitly addressed each argument raised on review but have considered those arguments in deciding this case.

to the personnel action at issue that it could have been a pretext for gathering evidence to retaliate against the employee for whistleblowing. *Young*, 2024 MSPB 18, ¶¶ 14-15; *Russell v. Department of Justice*, 76 M.S.P.R. 317, 323-24 (1997). When such a showing has been made, the Board will consider evidence regarding the investigation—more specifically, an analysis of the factors set forth in *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999), as they relate to any report of misconduct and ensuing investigation that led to a personnel action—in determining whether the agency has met its clear and convincing evidence burden. *Young*, 2024 MSPB 18, ¶¶ 16. If the agency fails to meet this burden, the appellant will prevail on his affirmative defense, and the underlying personnel action will not stand. *Id.*, ¶ 24.

In determining whether the investigation is so closely related to the personnel action that it could have been a pretext for gathering evidence to retaliate against an employee for whistleblowing activity, the Board looks to where the investigation had its origins. *Young*, 2024 MSPB 18, ¶ 15; *Russell*, 76 M.S.P.R. at 323-24. In the initial decision, the administrative judge summarized witness testimony regarding the process the agency used in initiating the investigation. ID at 37-42. That process was lengthy and convoluted, but we reiterate it here for clarity.

The record demonstrates that in December 2014, a subordinate informed the appellants' first-line supervisor that she was aware that Drenth was having conversations over IM that were inappropriate and involved concerning comments. ID at 38; Hearing Transcript (HT) at 201, 476-77, 946-952 (testimony of the first-line supervisor and the subordinate). One month later, in January of 2015, the appellant's first-line supervisor approached the Director of Mission Support regarding the subordinate's concerns. HT at 201, 476-77 (testimony of the first-line supervisor and the Director of Mission Support). A few weeks later, the appellants' first-, second-, and third-line supervisors also approached the Director of Mission Support following a February 4, 2015 meeting to relay

additional concerns regarding Drenth's behavior at that meeting. HT at 477-78 (testimony of the Direct of Mission Support). Additionally, the appellants' fifth-line supervisor, who also was present at the February 4, 2015 meeting, asked the Director of Mission Support to request Drenth's IMs, which the Director did the next day. *Id.* at 489-90; CAF, Tab 47 at 257. In consideration of these reports, the Director of Mission Support contacted a human resources specialist about how to proceed. HT at 481 (testimony of the Director of Mission Support). She testified that the human resources specialist recommended that she submit an OOI hotline request to begin investigating. *Id.* Thus, on February 5, 2015, the Director of Mission Support initiated a complaint with OOI to request an investigation into Drenth's conduct. *Id.* at 290; CAF, Tab 47 at 257.

On February 25, 2015, OOI contacted OSC and informed the appellants' fifth-line supervisor that it was "more appropriate" for OSC management to handle the matter. CAF, Tab 47 at 289. OOI also advised OSC, however, that it should contact them again if additional allegations of misconduct arose. *Id.* At that point, the request for Drenth's IMs was completed, and the Director of Mission Support reviewed, for the first time, the contents of the IMs and learned that the conversations therein were with another OSC employee, Hackstall. *Id.* at 288; HT at 496-98 (testimony of the Director of Mission Support). She again contacted the human resources specialist, and both agreed that Appellant Hackstall's IMs also needed to be addressed. HT at 498 (testimony of the Director of Mission Support). Accordingly, the Director of Mission Support again contacted OOI to request an investigation. CAF, Tab 47 at 288. Based on the foregoing, we conclude that the Director of Mission Support was the agency official most responsible for initiating the investigation, both before and after her review of the appellants' IM records. In doing so, we acknowledge that she received reports and information from the first-, third-, and fifth-line supervisors in the process of initiating the investigation.

On May 6, 2015, OOI issued ROIs regarding both appellants. CAF, Tabs 77-78.[7] The reports included accounts of interviews regarding the appellants' conduct and how it came to the attention of their managers and hundreds of pages of records reflecting the appellants' IM communications. CAF, Tabs 77-78. Approximately 1 week later, OOI forwarded its ROIs to OPR for further analysis and disciplinary consideration. CAF, Tabs 75 at 6, Tab 76 at 6-7. Based on the ROIs, the agency proposed the appellants' removals based on charges of misuse of a Government computer system. CAF, Tab 75 at 6-24, Tab 76 at 6-23. It also charged Drenth with unprofessional conduct. CAF, Tab 76 at 25-26. Because the charges forming the bases for the removal actions were the direct result of the investigation, we find that the investigation was so closely related to the appellants' removals that it could have been a pretext for gathering evidence to retaliate against them. *See Young*, 2024 MSPB 18, ¶ 15; *Russell*, 76 M.S.P.R. at 324.

> *We supplement the administrative judge's Carr factor analysis with respect to the appellants' traditional whistleblower reprisal claim and, pursuant to Young, conduct a Carr factor analysis regarding their retaliatory investigation claim.*

Because the appellants have established a prima facie case of whistleblower reprisal with respect to both their removals and the alleged retaliatory investigation, the burden shifts to the agency to show by clear and convincing evidence that it would have taken those actions in the absence of their whistleblowing activity. *Young*, 2024 MSPB 18, ¶¶ 21-23; *Convington*, 2023 MSPB 5, ¶ 45. We have explained that, when an appellant raises both a traditional claim of whistleblower reprisal and a claim of whistleblower reprisal based on an allegation of a retaliatory investigation, as the appellants have done here, a separate and distinct analysis concerning whether the agency met its

---

[7] It appears that the agency on appeal submitted the ROI regarding Hackstall twice, instead of filing both his and Drenth's ROI. The contents of the ROIs are not in dispute, nor are their relation to the subsequent charges of misconduct.

burden may be necessary to eliminate the confusion that might result from the comingling of the two claims. *Young*, 2024 MSPB 18, ¶ 23. Accordingly, we address the agency's burden as it relates to the appellants' removal actions first, and then we turn to its burden regarding the alleged retaliatory investigation.

Traditional whistleblower reprisal claim

In determining whether the agency proved by clear and convincing evidence that it would have removed the appellants in the absence of their whistleblowing activity, the Board will consider the following factors: the strength of the agency's evidence in support of its action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr*, 185 F.3d at 1323; *Convington*, 2023 MSPB 5, ¶ 45. The Board does not view these factors as discrete elements, each of which the agency must prove by clear and convincing evidence, but rather weighs these factors together to determine whether the evidence is clear and convincing as a whole. *Lu v. Department of Homeland Security*, 122 M.S.P.R. 335, ¶ 7 (2015). The Board must consider all of the evidence, including evidence that detracts from the conclusion that the agency met its burden. *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012). After conducting a *Carr* factor analysis, the administrative judge determined that the agency met its burden. ID at 23-46. As explained below, we agree.

Regarding the first *Carr* factor, the administrative judge found that the strength of the agency's evidence was significant, noting that neither appellant contested the agency's charge that they transmitted the IMs at issue as set forth in the proposal notices. ID at 34. She also noted that the appellants stipulated that the agency's acceptable use policy for its computer system prohibited the transmission of inappropriate material, and that a warning about the appropriate use of the agency's computer system and a notice of potential sanctions for any

violation of the policy appeared whenever a user logged onto the system. ID at 34; CAF, Tab 59 at 3. The administrative judge then offered selected examples of the types of IMs sent between the appellants, which included "obscene, hateful, harmful, malicious, hostile, vulgar, defamatory, profane, offensive and or/racially, sexually, or ethnically objectionable" content. ID at 35-37.

On review, the appellants concede that the agency's evidence "proving the computer misuse charge is undisputed," but they argue that the agency's evidence in support of the penalty determination is insufficient. PFR File, Tab 5 at 25-26. Specifically, they argue that they were remorseful regarding the misconduct and have acknowledged the inappropriateness of their actions. *Id.* That the appellants have asserted remorse, however, does not diminish the evidence supporting a penalty of removal. Indeed, the agency's table of penalties pertaining to the misuse of Government property provides for a penalty of a 3- to 14-day suspension and an aggravated penalty of a 15-day suspension to removal. CAF, Tab 2 at 470. The guidelines on using the table provide that, when an employee commits more than one offense, the proposing or deciding official may consider whether the penalty should be in the aggravated penalty range for the most serious offense being charged. *Id.* at 459. Here, the appellants misused Government property more than 100 times each. *Id.* at 45-60, 72-89. Thus, applying the aggravated penalty range was more than appropriate. Moreover, the Board has found removal to be an appropriate penalty for similar misconduct. *See Rush v. Department of the Air Force*, 69 M.S.P.R. 416, 417-19 (affirming removal as the appropriate penalty for misconduct involving the repeated, excessive, and flagrant misuse of a Government computer); *Cobb v. Department of the Air Force*, 57 M.S.P.R. 47, 51-54 (1993) (finding the penalty of removal to be within the bounds of reasonableness for a charge of misuse of Government resources arising from an appellant's personal use of a Government computer). Accordingly, the appellants' argument on review does not provide a basis to

disturb the administrative judge's analysis of this factor, and we agree that it weighs heavily in favor of the agency.

Regarding the second *Carr* factor, the administrative judge discussed the motives of the proposing and deciding officials and found that, although the deciding official was aware of the appellants' whistleblowing activity, there was "no demonstrable reason why [the deciding official] would be motivated to retaliate." ID at 37. She further concluded that there was no motive to retaliate on the part of the proposing official. *Id.* Additionally, she acknowledged the appellants' arguments regarding the retaliatory motives of their supervisory chain, namely, the first-, third-, and fifth-line supervisors, but found that none of them made the decision to remove the appellants, nor was there any evidence that "any managerial official in [the appellants'] chain of command or referenced in their alleged disclosures directed the penalty imposed by OPR or had any influence in OPR's decision[-]making process." *Id.* She also considered the appellants' arguments that their supervisors acted in a retaliatory manner by pursuing the investigation of them, but ultimately found their arguments unavailing. ID at 38-43.

Regarding the administrative judge's findings concerning the proposing and deciding officials, we acknowledge that those officials were not the subject of the appellants' whistleblowing activity. Nonetheless, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has instructed us to examine whether a retaliatory motive could be imputed more broadly. *Miller v. Department of Justice*, 842 F.3d 1252, 1261-62 (Fed. Cir. 2006); *see Soto v. Department of Veterans Affairs*, 2022 MSPB 6, ¶¶ 14-15. Indeed, the Federal Circuit has explained that "[t]hose responsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures, and even if they do not know the whistleblower personally, as the criticism reflects on them in their capacities as managers and employees." *Whitmore*, 680 F.3d at 1370.

Here, both the proposing and deciding officials were employed in OPR, and thus, they were outside of the appellant's work unit and chain of command. Nonetheless, OPR is generally tasked with safeguarding the integrity of the agency and investigating claims of misconduct by employees. Thus, although the proposing and deciding officials were not the appellants' managers, they maintained an interest in the agency's reputation. Given that the deciding official was aware of the appellants' whistleblowing activity, she could have had a motive to retaliate. However, we find any such possible motive to be outweighed by the fact that neither official was the subject of the appellants' whistleblowing activity, nor were they in their immediate work unit.

The appellants' arguments on review largely relate to the administrative judge's analysis of the retaliatory motives of their supervisors and their role in initiating the investigation. PFR File, Tab 5 at 26-37. Because these arguments relate to the retaliatory investigation claim, we address them below. They also maintain, however, that their supervisors improperly influenced the disciplinary process within OPR. The U.S. Supreme Court has adopted the term "cat's paw" to describe such circumstances. *Dorney v. Department of the Army*, 117 M.S.P.R. 480, ¶ 11 (2012) (citing *Staub v. Proctor Hospital*, 562 U.S. 411 (2011)). Under the cat's paw theory, an appellant can show an imputed retaliatory motive by showing that a particular management official, acting because of improper animus, influences another agency official who is unaware of the improper animus when implementing a personnel action. *Karnes v. Department of Justice*, 2023 MSPB 12, ¶ 19.

With respect to the first- and third-line supervisors' alleged involvement in the removal actions, we agree with the administrative judge's finding that there is no evidence that they directed the penalty imposed by OPR or had any influence in OPR's decision-making process.[8] ID at 37. The appellants also argue on

---

[8] The appellants argue that the administrative judge erred with respect to the third-line supervisor's involvement in the removal, asserting that the evidence demonstrates that

review that the fifth-line supervisor influenced the disciplinary process within OPR and that she had a retaliatory motive for doing so. PFR File, Tab 5 at 32-33. Specifically, they argue that she forwarded information to OPR regarding the history of disciplinary actions, employees' statements, and physical security incident reports regarding Drenth's alleged conduct in the workplace. *Id.* at 32. The record confirms this involvement.[9] HT at 551 (testimony of the fifth-line supervisor); CAF, Tab 47 at 196. As such, we acknowledge that the fifth-line supervisor had some degree of influence on the OPR disciplinary process and that her actions in influencing OPR occurred after the appellants' whistleblowing activity. Nonetheless, the fifth-line supervisor was not the subject of the appellants' protected disclosures, perceived disclosures, or protected activity, nor is there any evidence that she suffered any negative consequences as a result of them. In any event, given her position as the Chief Technology Officer and the Assistant Administrator of OSC, she could have had a professional motive to retaliate against the appellants, as any criticism contained in the protected disclosure could reflect on her capacity as a manager. *See Whitmore*, 680 F.3d

---

he influenced the OPR disciplinary process. PFR File, Tab 5 at 31. They reference an email from the Director of Mission Support to, among others, the third-line supervisor instructing him to review the table of penalties as it related to Drenth's IMs and reminding him that they would discuss "a path forward." *Id.* The appellants also assert that the third-line supervisor assisted OPR with "decipher[ing]" some of the IMs. *Id.* Upon examination of this evidence however, we agree with the administrative judge that it fails to show that the third-line supervisor influenced the OPR disciplinary process. There is no reference in the email to OPR or any mention of a discussion with OPR about the table of penalties, CAF, Tab 41 at 14, and the assistance he provided in "decipher[ing]" some of the IMs appears to be limited to providing corresponding names to initials referenced in the IMs, HT at 515 (testimony of the Director of Mission Support). We find that neither of these pieces of evidence support a finding that the third-line supervisor influenced the OPR disciplinary process such that a retaliatory motive should be imputed to the OPR officials through the cat's paw theory.

[9] We acknowledge that the administrative judge appears to have credited the fifth-line supervisor's testimony that her contact with OPR was limited and did not have any effect on its decision to remove the appellant. ID at 41. Although we agree that her contact was limited, she nonetheless provided relevant documentation to OPR, serving as a type of gatekeeper of information relevant to the disciplinary proceedings.

at 1370; *see also Robinson v. Department of Veterans Affairs*, 923 F.3d 1004, 1019-20 (Fed. Cir. 2019). In weighing the evidence, however, we conclude that any such possible motive is slight. Based on the foregoing, we ultimately agree with the administrative judge that this factor favors the agency.

Turning to the third *Carr* factor, the administrative judge considered two employees identified by the agency who were found to also have sent and exchanged offensive messages. ID at 43-46. These employees were issued a letter of counseling and a letter of reprimand, respectively, based on their conduct. ID at 43-44. However, she found that the employees were not similarly situated comparators because their messages were not sent with the degree of regularity and were not as offensive as the appellants' messages. ID at 45-46. On review, the appellants argue that the administrative judge misapplied the law regarding comparators when she failed to consider the agency's alleged failure to similarly investigate the comparators. PFR File, Tab 5 at 37-39. Because this argument relates to the appellants' retaliatory investigation claim, we address it below.

We otherwise agree with the administrative judge that the potential comparators identified by the agency are not similarly situated. The proposing official testified that, although the agency issued those two employees only a letter of counseling and a letter of reprimand, those employees' IM messages did not contain the "over the top vileness" of the appellants' messages. HT at 875. Notably, the appellants do not appear to dispute that the alleged comparators' IMs were significantly less frequent and less offensive. Thus, we agree with the administrative judge's finding that "there are no comparator employees who engaged in the same misconduct as the appellants which involved transmitting hundreds of IMs containing profanity and extremely disrespectful and derogatory statements regarding their coworkers." ID at 46. The Federal Circuit and Board have held that the failure to produce evidence related to the third *Carr* factor cannot weigh in the agency's favor and may cause it to fail to meet its clear and

convincing burden. *Whitmore*, 680 F.3d at 1374; *Semenov v. Department of Veterans Affairs*, 2023 MSPB 16, ¶ 42. The Board also has recognized, however, that there may be situations in which the agency produces persuasive evidence that there are no comparators, and in such situations, the third *Carr* factor would be removed from the analysis. *Soto*, 2022 MSPB 6, ¶ 18 n.9; *see Young*, 2024 MSPB 18, ¶ 22 n. 12. That is the situation here, and therefore, we find that the third factor is not significant in our analysis.

Weighing these factors against one another and as a whole, we ultimately agree with the administrative judge that the agency proved by clear and convincing evidence that it would have removed the appellants even in the absence of their whistleblowing activity. ID at 34-46. Even assuming a slight institutional or professional motive to retaliate on the part of the deciding official and fifth-line supervisor, the agency's evidence in support of the removal actions is exceedingly strong and outweighs any motive to retaliate.[10] Accordingly, we discern no basis to disturb the administrative judge's ultimate conclusion with respect to the appellants' removal action.

Retaliatory investigation claim

When an appellant raises a whistleblower reprisal claim regarding a retaliatory investigation, the *Carr* factors must be assessed differently. *Young*, 2024 MSPB 18, ¶ 22. In considering *Carr* factor one in a retaliatory investigation claim, the Board will consider the strength of the evidence that the agency official had before her when she made her report or initiated the investigation, rather than the evidence that was discovered as a result of the investigation. *Id.* Regarding *Carr* factor two, the Board will consider the motive to retaliate on the part of the official who made the report or initiated the investigation. *Id.* When considering *Carr* factor three, the Board will consider any evidence regarding the

---

[10] Even if the absence of comparator evidence were due to the agency's failure to make a sufficient proffer of evidence, resulting in the third *Carr* factor cutting slightly against the agency, we would still conclude that the agency met its overall burden.

reporting of alleged misconduct or initiation of investigations into similarly situated nonwhistleblowers. *Id.*

In considering the first *Carr* factor, we reiterate that the primary agency official responsible for initiating the investigation was the Director of Mission Support. At the hearing, she testified that, in January 2015, she received a report from the appellants' first-line supervisor regarding a subordinate's concerns about Drenth's IMs being inappropriate. HT at 476-77 (testimony of the Director of Mission Support). She further testified that the first-line supervisor was particularly concerned about the IMs because Drenth "knew where she lived." *Id.* at 477. The first-line supervisor similarly testified regarding this conversation. HT at 326-27 (testimony of the first-line supervisor). The Director of Mission Support further testified that, less than 1 month later, the appellants' first-, second-, and third-line supervisors all approached her, either by email or in her office, following a February 4, 2015 meeting to relay additional concerns regarding Drenth's behavior at the meeting. HT at 477-78 (testimony of the Direct of Mission Support). Their reports included concerns that Drenth displayed "erratic behavior" at the meeting and that other employees complained to them that Drenth's actions caused them to be "concerned for their personal safety" due to his "inappropriate and irresponsible behavior, gestures, [and] language." *Id.* at 482, 484. Following these reports, the Director of Mission Support testified that she contacted the human resources specialist about how to proceed and that he instructed her to file an OOI hotline request to initiate an investigation. *Id.* at 480-81. Although OOI returned the matter back to OSC management, the Director of Mission Support was able to review the actual contents of Drenth's IM history, which caused her to again contact OOI to initiate an investigation, which this time included Hackstall. CAF, Tab 47 at 288-89; HT at 496-98 (testimony of the Director of Mission Support). Based on the foregoing, we find that the Director of Mission Support had sufficient evidence to request an investigation both times.

In so finding, we observe that no agency witness testified regarding their knowledge of the specific contents of Drenth's IMs prior to the Director of Mission Support's receipt of his IM history log. The hearing testimony from the Director of Mission Support, the first-line supervisor, and the subordinate regarding the initial reports in December 2014 and January 2015 of inappropriate IM usage lacked specificity. Thus, when the Director included this allegation in her request for an OOI investigation on February 5, 2015, she lacked detail regarding the actual substance of the IM messages. But the purpose of an investigation is to uncover facts, *see Young*, 2024 MSPB 18, ¶ 23 n.10, and the Director of Mission Support had a reasonable expectation that her initiating the investigation would have done so. Further, any lack in specificity regarding the information the Director of Mission Support had when she first initiated the investigation on February 5, 2015, is offset by the overwhelming evidence she had regarding Drenth's behavior at the February 4, 2015 meeting, which also formed the basis of her decision to request an investigation, and the evidence she received as a result of the request for Drenth's IMs, which caused her to contact OOI again for an investigation. This, coupled with her consultation with the human resources specialist who, on both occasions, advised her to submit an OOI request, leads us to conclude that the evidence before her when she initiated the requests for investigation was strong.[11] Accordingly, we conclude that this factor weighs heavily in favor of the agency.

We next turn to the second *Carr* factor—the motive to retaliate on the part of the agency official who initiated the investigation. Relevant evidence

---

[11] The allegations of inappropriate IMs warranted an investigation to determine if there was any misconduct and its exact nature. An agency need not wait to investigate reasonable allegations of employee misconduct until the misconduct becomes more severe or obvious. *Young*, 2024 MSPB 18, ¶ 23 n.10; *cf. Thomas v. Department of the Army*, 2022 MSPB 35, ¶ 27 (explaining that an agency does not have to tolerate inappropriate conduct of a sexual nature until it becomes so pervasive and severe that it exposes the agency to liability under equal employment opportunity statutes); *Lentine v. Department of the Treasury*, 94 M.S.P.R. 676, ¶ 13 (2003) (same).

concerning this factor includes whether the responsible agency official was the subject of the appellant's whistleblowing activity, whether she suffered any consequences as a result of the appellant's whistleblowing, and how soon after the appellant's whistleblowing she made the report or initiated the investigation. *Young*, 2024 MSPB 18, ¶ 22; *Russell*, 76 M.S.P.R. at 326.

As an initial matter, we observe that the investigation was originally initiated on February 5, 2015, and reinitiated on or around March 9, 2015. HT at 481, 498 (testimony of the Director of Mission Support); CAF, Tab 47 at 288. The appellants were not perceived as whistleblowers until approximately March 26, 2015, and Hackstall did not engage in the protected activity of providing a statement of support of Drenth during Drenth's removal proceedings until November 15, 2015. CAF, Tab 2 at 342-43, Tab 41 at 5. Whistleblowing activity that occurs after the action at issue, here, the initiation of the investigation, could not have played a role in the decision to take the action. *See Lu*, 122 M.S.P.R. 335, ¶ 11 (reasoning that, because the issue in a whistleblower reprisal appeal is whether the challenged action was taken in reprisal for the appellant's protected disclosures, events that preceded the disclosures will often have little or no relevance); *Mason v. Department of Homeland Security*, 116 M.S.P.R. 135, ¶ 27 (2011) (stating that disclosures made after the agency action at issue could not have been a contributing factor in that action). Accordingly, we analyze this *Carr* factor only with respect to Drenth's January 21, 2015 protected disclosure. We do not discuss any retaliatory motive regarding Hackstall because all of his whistleblowing activity post-dates the initiation of the investigation.

Regarding Drenth's January 21, 2015 protected disclosure, in which he expressed his concern to his fourth- and fifth-line supervisors that his third-line supervisor was violating merit systems principles, abusing his authority in selection and hiring processes, and inappropriately using Government funds relating to a Government contractor, the Director of Mission Support was not the

subject of it and was, therefore, unlikely to have been adversely affected by it. Further, we are unable to discern from the record whether she was aware of the January 21, 2015 disclosure when she requested the investigation. Nonetheless, we acknowledge that, as an agency official in a supervisory role, she could have had a professional motive to retaliate. *See Whitmore*, 680 F.3d at 1370; *Robinson*, 923 F.3d at 1019-20. Any such possible motive, however, must be balanced against the fact that she was not the subject of the disclosure, nor is there any evidence that she suffered negative consequences as a result of it. *See Young*, 2024 MSPB 18, ¶ 22. Based on the foregoing, we find that the Director of Mission Support did not have a strong motive, if any, to retaliate against the appellants.

Nonetheless, the appellants have asserted that their first-, third-, and fifth-line supervisors influenced the decision to initiate an investigation and had retaliatory motives to do so. CAF, Tab 27 at 29, 44. We construe this argument as one asserting the cat's paw theory which, again, concerns imputing a retaliatory motive by showing that a particular management official, acting because of improper animus, influences another agency official who is unaware of the improper animus when implementing a personnel action. *See Karnes*, 2023 MSPB 12, ¶ 19. We have previously explained that the cat's paw theory may also apply to retaliatory investigations. *See Young*, 2024 MSPB 18, ¶ 22 n.11 (explaining that, although the *Carr* factor analysis for a retaliatory investigation claim differs from the *Carr* factor analysis for a traditional whistleblower reprisal claim, certain principles that guide that analysis may be applicable, such as the Board's consideration of the cat's paw theory). Accordingly, we consider the appellants' claims regarding their first-, third-, and fifth-line supervisors under the cat's paw theory.

Regarding the appellants' first-line supervisor, we observe that she relayed a report from a coworker regarding Drenth's IM activity to the Director of Mission Support on January 12, 2015. HT at 339-40 (testimony of the first-line

supervisor); CAF, Tab 40 at 7. Drenth did not make his protected disclosure until more than 1 week later, on January 21, 2015. HT at 38-52 (testimony of Drenth). Thus, the first-line supervisor's involvement in initiating the investigation occurred before Drenth made a protected disclosure. Therefore, the protected disclosure could not have created a motive to retaliate in the first-line supervisor.[12] *See Lu*, 122 M.S.P.R. 335, ¶ 11; *Mason*, 116 M.S.P.R. 135, ¶ 27.

Regarding the third- and fifth-line supervisors, we previously noted that the fifth-line supervisor urged the Director of Mission Support to formally request Drenth's IM records. HT at 489-90 (testimony of the Director of Mission Support); CAF, Tab 47 at 257. Following production of the initial round of IM messages, the investigation accelerated and expanded. HT at 498 (testimony of the Director of Mission Support); CAF, Tab 47 at 288. Regarding the third-line supervisor, we previously noted that he reported concerns about Drenth's behavior at a meeting to the Director of Mission Support, which was a primary factor in her deciding to initiate the investigation. HT at 478 (testimony of the Director of Mission Support). Additionally, the record establishes that in the early stages of the investigation, the third-line supervisor coordinated the collection of the appellants' IMs and identified the relevant timeframe for which the agency should collect the IMs.[13] HT at 506, 584-85 (testimony of the Director of Mission Support); CAF, Tab 47 at 168-69. At that point, however, the

---

[12] Although the first-line supervisor's influence in initiating the investigation predates all of the whistleblowing activity, we acknowledge that the record includes evidence suggesting that she negatively reacted to the appellants' apparent allegations of fraud and, several months later, requested that the agency access the appellants' messages. CAF, Tab 41 at 5. However, by that time, her involvement in initiating the investigation had already occurred.

[13] We acknowledge that the administrative judge credited the third-line supervisor's testimony that he did not direct his subordinates to gather information on the appellants, that he did not have any involvement in referring the alleged misconduct to OOI, and that he did not request Drenth's IMs. ID at 42; HT at 625-630. Our discussion does not contradict this credibility determination.

investigation was already underway. Based on the foregoing, we agree with the appellants that these officials influenced the decision to initiate the investigation.

In the initial decision, the administrative judge addressed the question of whether these individuals had any improper animus in influencing the decision to initiate an investigation, but she concluded that "there is no showing that any agency official was found to have engaged in conduct that was a violation under 5 U.S.C. § 2302(b)(8)" and that there was no showing that they had any motive to retaliate. ID at 38. Regarding the administrative judge's first point, the Board generally has not recognized this factor as relevant to the question of whether any agency officials had a motive to retaliate, and we decline to do so here.

We also disagree with the administrative judge's finding that there is no evidence that these officials had any motive to retaliate. Drenth's January 21, 2015 disclosure regarding hiring improprieties and an inappropriate use of contract funds directly implicated the third-line supervisor, and after learning of the disclosure, the third-line supervisor emailed his supervisor addressing the accusations and stating his concern that Drenth was "slander[ing his] good name and reputation." CAF, Tab 40 at 15-17. Further, his involvement in initiating the investigation into Drenth occurred just a few weeks later, when he reported Drenth's behavior at a meeting, and continued on throughout the investigation process. Such circumstances suggest that the third-line supervisor had a motive to retaliate against Drenth. *See Young*, 2024 MSPB 18, ¶ 22 (explaining that relevant factors in determining a motive to retaliate include whether the official was the subject of the appellant's whistleblowing activity and how soon after the appellant's whistleblowing he made the report or initiated the investigation); *Larson v. Department of the Army*, 91 M.S.P.R. 511, ¶ 13 (2002) (concluding that an official had some motive to retaliate when he was the subject of the appellant's whistleblowing and was aware of it at the time he took the relevant action).

Additionally, although Drenth's disclosure did not implicate the fifth-line supervisor, both she and the third-line supervisor are agency officials who are, in

some way, responsible for the performance of the agency and, as such, any criticism may reflect on them in their capacities as managers and employees. *Whitmore*, 680 F.3d at 1370; *see Robinson*, 923 F.3d at 1019-20. Thus, these officials could also have had a professional motive to retaliate. *See Whitmore*, 680 F.3d at 1370; *see also Robinson*, 923 F.3d at 1019-20. In sum, we find a motive to retaliate on the part of the fifth- and, particularly, the third-line supervisor in their roles relating to initiating the investigation. Ultimately, we find that this factor cuts against the agency.

Regarding the third *Carr* factor, we noted above that the administrative judge found that there were no comparator employees because, although the employees identified by the agency were also found to have sent and exchanged offensive IMs, their messages were not sent with the degree of regularity and vulgarity as the messages sent by the appellants. ID at 43-46. The appellants argue on review, however, that the administrative judge failed to consider the comparators in the context of their retaliatory investigation claim and erroneously limited her consideration of the alleged comparators to the removal action. In their petition for review, the appellants point to *Shibuya v. Department of Agriculture*, 119 M.S.P.R. 537, ¶ 34 (2013), wherein the Board upheld an administrative judge's finding that an agency treated nonwhistleblowers less harshly when it failed to investigate a comparator's misconduct after it learned of it, yet immediately investigated the whistleblower's misconduct when it learned of it. PFR File, Tab 5 at 37-39. Relying on that case, they argue that when the agency learned of the improper IMs from the two comparators, it only issued them a letter of counseling and a letter of reprimand without subjecting them to a separate investigation into their alleged conduct, and that such disparate treatment weighs against the agency. *Id.*

We are not persuaded by the appellants' argument. The instant appeal presents a unique set of facts. A significant factor in the initiation of the investigation into Drenth's IM activity was his conduct during the February 4,

2015 meeting. HT at 477, 481-82, 489-90 (testimony of the Director of Mission Support). The appellants have not alleged that the two comparators at issue here engaged in any unprofessional conduct that coincided with their inappropriate messaging.

Further, the initial contact with OOI to initiate an investigation on February 5, 2015, was directed only at Drenth. It was during these preliminary stages when the agency learned that Hackstall was engaging in similar activity and included him in the investigation. CAF, Tab 47 at 288. Importantly, at that point, Hackstall had not engaged in any protected activity, nor was he yet perceived as a whistleblower. Thus, the agency's actions with respect to Hackstall support a conclusion that the decision to investigate any particular employee was based on the degree of regularity and offensiveness of the employee's IMs, rather than on protected whistleblowing activity. Notably, the appellants do not dispute that the alleged comparators' IMs were significantly less frequent and less offensive. As such, we agree with the administrative judge that the two identified employees do not constitute comparators, even in the context of a retaliatory investigation claim, and instead, we conclude that Hackstall is a more appropriate comparator for purposes of this factor. Based on the foregoing, we find that this factor slightly favors the agency.

Although we found that there is evidence that agency officials who were involved in the initiation of the investigation had a motive to retaliate, those motives vary in degree, as does their influence on the decision to investigate the appellants. Further, the strong evidence supporting the decision to initiate the investigation and the agency's treatment of Hackstall, who at the time the investigation into him began, was a similarly situated nonwhistleblower, outweigh any retaliatory animus on the part of the officials who initiated or influenced the decision to initiate the investigation into the appellants. Accordingly, we find that the agency established by clear and convincing evidence that it would have investigated the appellants even in the absence of

their protected whistleblowing activity. Thus, we ultimately agree with the administrative judge's decision to deny the appellants' affirmative defense of whistleblower reprisal.

The penalty of removal is reasonable.

The appellants also argue that the administrative judge erred in finding the penalty of removal reasonable. PFR File, Tab 5 at 39-45. When all of the agency's charges are sustained, the Board will review the agency-imposed penalty only to determine if the agency considered all of the relevant factors and exercised management discretion within the tolerable limits of reasonableness. *Thomas v. Department of the Army*, 2022 MSPB 35, ¶ 19; *Ellis v. Department of Defense*, 114 M.S.P.R. 407, ¶ 11 (2010).

At the hearing, the deciding official testified regarding her analysis of the *Douglas*[14] factors wherein she weighed aggravating and mitigating factors. HT at 897-903, 909-14 (testimony of the deciding official). She testified that both appellants' positions required that they work and communicate with agency and airport officials and required her to trust that the employees in those positions will treat others with respect and not subject others to rude or hateful behavior. *Id.* at 897, 904-05. She also added that Hackstall was a higher-level employee than Drenth and that he, therefore, had a greater responsibility to communicate appropriately with contractors and stakeholders. *Id.* at 909. She testified that she considered both appellants' length of service, the absence of any disciplinary history, and their performance records as mitigating factors, *id.* at 897, 904-05, but ultimately determined that those factors were outweighed by the appellants' lack of remorse, lack of rehabilitative potential, and the seriousness of the offenses, *id.* at 897-88, 904-05. She testified that she considered other penalties

---

[14] In *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305-06 (1981), the Board set forth a nonexhaustive list of factors for consideration in assessing the reasonableness of a penalty.

for the appellants, but felt that none would "fix" the misconduct and that removal was the least severe action she could take. *Id.* at 913-14.

In the initial decision, the administrative judge found that the deciding official properly weighed the *Douglas* factors and that the penalty of removal was reasonable. ID at 46-51. On review, the appellants contend that the initial decision failed to consider as a mitigating factor the alleged concerted targeting in the underlying investigation and ignored the alleged existence of disparate penalties. PFR File, Tab 5 at 40, 43-47. The appellants also claim that the initial decision improperly assessed their potential for rehabilitation and erred in considering their "vigorous defense" to the charges as an aggravating factor. *Id.* at 40-43.

Regarding the appellants' argument that the deciding official should have considered as a mitigating factor the agency's alleged targeting of the appellants in an investigation, we find no error in the penalty analysis. The allegation that the appellants were targeted is effectively an incorporation of their whistleblower reprisal affirmative defense into the penalty analysis. The deciding official testified that she considered these allegations but that, even if the appellants were whistleblowers, they were nonetheless beholden to the agency's policies regarding the appropriate use of a Government computer system. HT at 896, 906 (testimony of the deciding official). The administrative judge agreed with this assessment, as do we on review. ID at 50. As we recently reiterated in *Young*, 2024 MSPB 18, ¶ 19, the whistleblower protection statutes only shield an employee from the consequences of misconduct when the record supports a finding that he would not have been disciplined except for his status as a whistleblower. *See Marano v. Department of Justice*, 2 F.3d 1137, 1142 (Fed. Cir. 1993) (explaining that, when an appellant makes a prima facie showing of whistleblower reprisal and the agency does not prove by clear and convincing evidence that it would have taken the same action in the absence of the whistleblowing, then "no harm can come to the whistleblower"). As thoroughly

explained above, the agency proved that it would have investigated and removed the appellants even in the absence of their whistleblowing. Thus, they are not shielded from the consequences of their misconduct.

Regarding the appellants' argument that the consistency of the penalty was improperly ignored, PFR File, Tab 5 at 43-45, the deciding official testified that she looked for comparative discipline and could not locate any, HT at 937 (testimony of the deciding official). Further, the administrative judge did not discuss the consistency of the penalty because she had already determined that the alleged comparators were not similarly situated given their substantially fewer IMs that did not remotely approach the offensiveness of the appellants' IMs. We have agreed with this assessment; therefore, we find no error regarding the impact of any alleged penalty inconsistency on the penalty analysis. *See Singh v. U.S. Postal Service*, 2022 MSPB 15, ¶¶ 9-18 (discussing the criteria for establishing a claim that then penalty was inconsistent).

Regarding the appellants' arguments that the agency misjudged their potential for rehabilitation, we acknowledge that, upon the agency's discovery of the appellants' improper use of the IM system on a Government computer, they ceased engaging in the misconduct. CAF, Tab 2 at 158, 323; HT at 926, 930 (testimony of the deciding official). Regarding their argument that the agency "punished" them for engaging in a vigorous defense, we also recognize that a deciding official may not consider a denial of misconduct as a showing of lack of remorse. *Smith v. Department of the Navy*, 62 M.S.P.R. 616, 621 (1994). Nonetheless, we agree with the deciding official and the administrative judge that the misconduct demonstrates a type of behavior that reflects the appellants' general attitudes and lack of respect regarding their workplace. Therefore, even if these factors could have been analyzed differently, we nonetheless find that, due to the nature and seriousness of the appellants' misconduct, the nature of their positions as requiring communication and trust with other agency and airport officials, and the fact that they were on notice of the policies against

improper use of a Government computer, the penalty of removal is reasonable. *Martin v. Department of Transportation*, 103 M.S.P.R. 153, ¶ 13 (2006) (stating that, in assessing whether the agency's selected penalty is within the tolerable limits of reasonableness, the most important factor is the nature and seriousness of the misconduct and its relation to the employee's duties, position, and responsibilities), *aff'd*, 224 F. App'x 974 (Fed. Cir. 2007); *see Quillen v. Department of the Treasury*, 96 M.S.P.R. 154, ¶ 10 (2004) (reversing an administrative judge's mitigation of a removal penalty when, despite no prior discipline and several years of service with positive performance evaluations, an appellant was warned against unauthorized computer usage, yet continued to engage in such usage), *aff'd per curiam*, 134 F. App'x 449 (Fed. Cir. 2005). Accordingly, we will not disturb the agency's selected penalty of removal.

The administrative judge did not abuse her discretion in denying the appellants' motion for sanctions.

On review, the appellants also argue that the administrative judge abused her discretion when she denied their motion for sanctions for the agency's alleged failure to comply with her discovery orders. PFR File, Tab 5 at 47-52; CAF, Tab 82. While sanctions may be appropriate to serve the ends of justice, they should only be imposed when a party has failed to exercise basic due diligence in complying with an order or has exhibited negligence or bad faith in its efforts to comply. *Armstrong v. Department of Justice*, 107 M.S.P.R. 375, ¶ 25 (2007), *overruled on other grounds by Edwards v. Department of Labor*, 2022 MSPB 9, *aff'd*, No. 2022-1967, 2023 WL 4398002 (Fed. Cir. July 07, 2023). In determining whether sanctions are appropriate, good faith efforts short of full compliance must be considered. *Id.* Absent a showing of an abuse of discretion, an administrative judge's determination regarding sanctions will not be reversed. *Id.*

Here, the basis for the appellants' motion was the agency's failure to comply with the administrative judge's acknowledgement order, which ordered

the parties to assist in the expeditious processing of the case by honoring requests for relevant documents without additional Board intervention, and an order included in the administrative judge's summary of a conference call, which ordered the parties to attempt to work out any discovery disputes without her intervention. CAF, Tab 82 at 8. The appellants assert that the agency failed to comply with these orders because it did not produce during the discovery period the letter of reprimand for the alleged comparator or any internal and external OPR communications regarding the appellants. CAF, Tab 82. The administrative judge considered the appellants' motion and the agency's response thereto and found that the allegations regarding the OPR communications were untimely because they were not raised until the third day of the hearing. CAF, Tabs 82, 84, 85 at 2-4. She also found the appellants' allegations regarding the alleged comparator's letter of reprimand to be unconvincing because the agency produced the letter the morning after discovering that it could be relevant as comparator evidence and because the appellants still had the opportunity to question relevant witnesses regarding the document. CAF, Tab 85 at 4.

We have thoroughly reviewed the record and find no abuse of discretion. Although the documents at the core of the motion for sanctions were not produced during the standard discovery period, relevant OPR communication documents were produced on the day that affirmative defense submissions were due, well before the hearing, CAF, Tab 47 at 195-230, and the letter of reprimand for the alleged comparator was ultimately produced with sufficient time for the appellants to question relevant witnesses, HT at 666, 875-81. Further, despite the delay in producing the documents, we have reviewed the agency's explanation for its failure to produce the relevant documents during the discovery period, HT at 666-70, and we find that, although the agency may have fallen short of full compliance during the discovery period, there is no evidence of bad faith, *see Armstrong*, 107 M.S.P.R. 375, ¶ 25. Accordingly, we find that the administrative

judge did not abuse her discretion in denying the appellants' motion for sanctions.

We have considered all of the appellants' arguments on review and have determined that none warrant reversal of the initial decision. Accordingly, we deny the appellants' petition for review and affirm the initial decision, except where expressly modified.

## NOTICE OF APPEAL RIGHTS[15]

The initial decision, as supplemented by this Final Order, constitutes the Boards final decision in this matter. 5 C.F.R. § 1201.113. You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

---

[15] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

**(1) <u>Judicial review in general</u>**.   As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision.   5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) <u>Judicial or EEOC review of cases involving a claim of discrimination</u>**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you</u>

<u>receive</u> this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** <u>after your representative</u> receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) <u>Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012</u>**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[16]  The court of appeals must <u>receive</u> your petition for review within **60 days** of the <u>date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(B).

---

[16] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.


*Gina K. Grippando*

FOR THE BOARD:                    _____
                                  Gina K. Grippando
                                  Clerk of the Board
Washington, D.C.